IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TERRANCE E. EVERETT, | § | |
| | § | No. 257, 2017 |
| Defendant Below, | § | |
| Appellant, | § | |
| | § | Court Below: |
| v. | § | Superior Court of the |
| | § | State of Delaware |
| STATE OF DELAWARE, | § | |
| | § | |
| | § | Cr. I.D. No. 1511002499 (N) |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: March 21, 2018
Decided: May 29, 2018

Before **VALIHURA**, **VAUGHN,** and **TRAYNOR**, Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

Nicole M. Walker, Esquire, Office of the Public Defender, Wilmington, Delaware, for Appellant.

Martin B. O'Connor, Esquire, Department of Justice, Wilmington, Delaware, for Appellee.

**VALIHURA**, Justice:

When a person voluntarily accepts a "friend" request on Facebook from an undercover police officer, and then exposes incriminating evidence, does the Fourth Amendment protect against this mistaken trust? We conclude that it does not.

Here, the defendant-appellant, Terrance Everett ("Everett"), accepted the friend request from a detective who was using a fictitious profile. The detective then used information gained from such monitoring to obtain a search warrant for Everett's house, where officers discovered evidence that prosecutors subsequently used to convict him.

In the proceedings below, Everett moved for a so-called reverse-*Franks* hearing, named for the United States Supreme Court opinion in *Franks v. Delaware*.[1] He asked the trial court to determine whether the detective knowingly and intentionally, or with reckless disregard for the truth, omitted information from the affidavit—namely, information concerning the detective's covert Facebook monitoring—that was material to the magistrate's finding of probable cause. Everett argued that, if he made this showing by a preponderance of the evidence at such a hearing, then the evidence obtained via this warrant should be suppressed. The Superior Court denied Everett's motion from the bench on February 16, 2017. Everett appeals that decision and now seeks reversal of his conviction.

For the reasons set forth below, we AFFIRM the Superior Court's denial of Everett's motion.

---

[1] 438 U.S. 154 (1978).

## A.    Factual Background

At some point during 2012 or 2013, Detective Bradley Landis of the New Castle County Police Department began monitoring Everett's Facebook page using a fake profile, including a fake name and pictures.  Detective Landis regularly monitored Everett's page between one to three times per week for at least two years.  During this monitoring, Detective Landis used the fake profile to send Everett a "friend request."  Everett accepted the "friend request."  Based on the record before us, it is unclear what information from Everett's Facebook page was available to Detective Landis before "friending" Everett and what information was available only after the two became "friends."[2]

On November 4, 2015, Detective Landis saw a photo on Everett's Facebook page that was posted at 5:00 AM that morning.  The photo ("Photo") showed a nightstand with several items on top of it: a handgun, a Mercedes car key, a large amount of cash, a pay stub, two cell phones, and a framed photograph of Everett wearing a black T-shirt and a red necklace.  Although Everett was not in the Photo, the caption read: "Just getting in for the night, how I sleep every night."[3]

---

[2] When considering Everett's motion, the trial judge questioned both parties about Everett's Facebook privacy settings.  Everett's counsel stated that he did not know whether the photos in evidence were "Friend-only protected" or whether they were viewable on Everett's public profile.  Trial Transcript (Feb. 15, 2017), at A095.  The State noted that it appeared that, "at some point, maybe in 2016," Everett changed his Facebook profile to a "private page, which does restrict some access."  *Id.*  But, the State also argued that, "at some point, there is evidence to suggest that it was, in fact, a public page that anyone could go on and look at."  *Id.*

[3] Search Warrant Application and Affidavit (Nov. 4, 2015), at A018 [hereinafter Warrant Affidavit].

2

On that same day, November 4, 2015, Detective Landis applied for a warrant to search Everett's house. In the application, Detective Landis swore that he:

- observed Everett's Facebook page and the Photo "while browsing Facebook";

- knew the Facebook page was Everett's because Everett posted daily self-filmed videos and photographs at various locations, and he was familiar with Everett from previous contacts and criminal investigations;

- personally saw Everett operate a tan Mercedes on multiple occasions;

- was aware that Everett was a person prohibited from possessing deadly weapons, including firearms, due to numerous violent felony convictions;

- was aware that Everett was currently on federal probation for conspiracy to possess with intent to distribute more than 500 grams of cocaine and cocaine base, and that Everett would be on federal probation until January 2020;

- was aware that Everett was currently being supervised by the Delaware Probation and Parole Sex Crimes unit;

- contacted Everett's probation officer to verify Everett's address and then drove past Everett's residence and observed a tan Mercedes parked out front;

- observed distinguishing features on the handgun upon closer examination of the Photo and, after additional investigation on the Smith & Wesson website, determined that the firearm in the Photo was in fact a Smith & Wesson.

The search warrant, which was both authorized and executed on November 5, 2015, allowed police to conduct a daytime search of Everett's residence to collect DNA samples and/or a deadly weapon. During the search of Everett's home, police recovered a loaded nine-millimeter Smith & Wesson handgun; the handgun's original box with a serial number matching the Smith & Wesson handgun; clothing, including the black T-shirt and the red necklace that Everett was wearing in the Photo and other Facebook photos; and Everett's pay stubs.

3

Police arrested Everett on November 17, 2015. A Grand Jury indicted him on December 21, 2015, for one count of Possession of a Firearm By a Person Prohibited in violation of 11 *Del. C.* § 1448, and one count of Possession of Ammunition By a Person Prohibited in violation of 11 *Del. C.* § 1448. According to the indictment, Everett was a "person prohibited" because he had previously been convicted of two felony counts of Reckless Endangering (first degree) and one felony count of Possession with Intent to Deliver a Controlled Substance.[4] A jury trial began on February 14, 2017, and the parties stipulated that Everett was a person prohibited.

On the first day of trial, Detective Landis disclosed that he began monitoring Everett's Facebook page "approximately two years" before he saw the Photo. Further, Detective Landis testified that he monitored Everett's page by using a fake Facebook profile under a fake name and using photos that he found on the Internet, rather than his own personal photos. The day after learning the details of Detective Landis's monitoring of his Facebook page, Everett moved for a mistrial or, in the alternative, a reverse-*Franks* hearing.[5] The Superior Court denied the motion in a bench ruling on February 16, 2017.[6]

---

[4] Indictment at A014. The warrant affidavit also states that a search of the Delaware Criminal Justice Information System revealed that "Terrance has been convicted twice of Reckless Endangering First (05/06/02, 11/23/10), three counts of Unlawful Sexual Contact (08/08/96), and Possession with intent to deliver a narcotic schedule II controlled substance (10/19/05), all of which are violent felonies." Warrant Affidavit, *supra* note 3, at A019.

[5] Trial Transcript (Feb. 15, 2017), at A092. There is no written motion in the record. Rather, at the start of the second day of the trial, Everett's counsel stated to the court: "I am assuming Your Honor got my e-mail this morning?" *Id.* Everett's counsel then said that he provided the State with a copy of the e-mail. *Id.*

[6] Trial Transcript (Feb. 16, 2017), at A108.

In denying the motion, the trial judge found "that the omitted facts were not material for [the] purposes of issuance of a search warrant."[7]

On February 16, 2017, the jury found Everett guilty of only one of the charges, Possession of a Firearm By a Person Prohibited, and the Superior Court ordered a presentence investigation. On February 22, 2017, Everett filed a Motion for a New Trial arguing that the two verdicts were legally inconsistent because he was found guilty on the possession charge but not the ammunition charge. The Superior Court denied the motion on May 18, 2017. The State filed a motion to declare Everett a habitual offender, and the Superior Court granted the motion on June 2, 2017. The court sentenced Everett to fifteen years of Level V imprisonment, followed by six months of Level II probation.

### B.      Scope and Standard of Review

This Court "review[s] a trial court's evidentiary rulings for abuse of discretion."[8] "Where the facts are not in dispute and only a constitutional claim of probable cause is at issue, this Court's review of the Superior Court's ruling is *de novo*."[9]

---

[7] *Id.*

[8] *Adams v. State*, 124 A.3d 38, 45 (Del. 2015) (citing *Jones v. State*, 940 A.2d 1, 9 (Del. 2007)). Generally, a request for a *Franks* or reverse-*Franks* hearing accompanies a motion to suppress, and this Court reviews the denial of such motions for abuse of discretion. *See Restrepo-Duque v. State*, 130 A.3d 340, 2015 WL 9268145, at *3 (Del. Dec. 17, 2015) (TABLE) ("This Court reviews a trial court's evidentiary rulings, including a denial of a motion to suppress, for abuse of discretion." (citing *Adams*, 124 A.3d at 45)).

[9] *State v. Holden*, 60 A.3d 1110, 1113 (Del. 2013) (citing *Smith v. State*, 887 A.2d 470, 473 (Del. 2005)).

## C. Analysis

Everett's claim is somewhat convoluted, but his central argument is that Detective Landis's monitoring of his Facebook page constituted an unlawful, warrantless "search" and, thus, any information seized pursuant to it must be suppressed as the fruit of the poisonous tree in violation of the Fourth Amendment of the United States Constitution and Article I, Section 6 of the Delaware Constitution. However, instead of launching a direct challenge under the search-and-seizure provisions of the United States and Delaware Constitutions, Everett asserts a so-called reverse-*Franks* claim[10] and, as such, argues that the Superior Court erred in denying him a hearing to determine whether Detective Landis knowingly and intentionally, or with reckless disregard for the truth, omitted information from his warrant affidavit that would have vitiated the magistrate's finding of probable cause—*i.e.*, that the affidavit omitted material information. That is, Everett argues that, had the authorizing magistrate known about the "arbitrary ruse" that Detective Landis employed via Facebook, the magistrate would have denied the warrant application because the affidavit's facts about Everett's Facebook page were based on an unconstitutional search, and thus any evidence seized under such a warrant should be suppressed.

---

[10] This is known as a "reverse-*Franks*" claim because it is the converse of the situation in *Franks v. Delaware*, 438 U.S. 154 (1978), where the United States Supreme Court held that, "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id.* at 155-56; *see Sisson v. State*, 903 A.2d 288, 300 (Del. 2006) ("If the police omit facts that are material to a finding of probable cause with reckless disregard for the truth, then the rationale of *Franks v. Delaware* applies." (quoting *Smith v. State*, 887 A.2d 470, 472 (Del. 2005))).

6

Despite Everett's awkward framing, we consider his argument for what it is: a claim that Detective Landis's Facebook monitoring violated his constitutional rights and that, without that tainted information, the search warrant affidavit did not establish probable cause.

We evaluate that argument under a two-step framework. First, we consider whether the Facebook monitoring violated the Fourth Amendment or Article I, Section 6 of the Delaware Constitution. If it did, then we "must 'excise the tainted evidence [from the warrant affidavit] and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue [the] warrant.'"[11] In this case, we need not go beyond the first step: Detective Landis's monitoring of Everett on Facebook did not run afoul of the Fourth Amendment or Article I, Section 6 of the Delaware Constitution.

Everett focuses his arguments on attempting to refute the trial court's conclusion that it was "unable to find any basis in law in support of the proposition that the dissembling conduct of law enforcement would have altered the magistrate's issuance of the search warrant."[12] Everett argues that "the trial court reached its erroneous conclusion without considering either Everett's legitimate expectation of privacy in his Facebook posts or the extent of Landis' intrusion upon that legitimate expectation,"[13] which is essentially arguing that the trial court ignored a Fourth Amendment or Article I, Section 6 violation. Everett

---

[11] *Jones v. State*, 28 A.3d 1046, 1058 (Del. 2011) (quoting *United States v. Herrold*, 962 F.2d 1131, 1138 (3d Cir. 1992)).

[12] Trial Transcript (Feb. 16, 2017), at A107.

[13] Appellant's Opening Br. at 11.

also argues that Detective Landis presented no evidence that the privacy settings of his Facebook page were "set to anything other than 'private.'" And, given that Detective Landis had "friended" Everett, Everett argues that it is reasonable to assume that his settings were "private" and, as such, the Photo itself was only viewable to his friends and, thus, he had a "legitimate expectation of privacy."[14] Finally, he asserts that, even assuming *arguendo* that his acceptance of Detective Landis's "friend" request amounted to consent, Detective Landis's use of deception rendered that consent involuntary because the detective lacked the reasonable suspicion to monitor him.

We reject Everett's contentions because Everett did not have a reasonable expectation that the Facebook posts that he voluntarily shared with Detective Landis's fake profile and other "friends" would not be disclosed. We observe that Detective Landis did not request or access the Photo directly from Facebook, the third-party service provider— a scenario that we need not address here. Rather, Everett made the Photo accessible to his "friends" and, by doing so, he assumed the risk that one of them might be a government officer or share his information with law enforcement.

The United States and Delaware Constitutions protect the rights of persons to be secure from "unreasonable searches and seizures."[15] A search does not occur "unless 'the individual manifested a subjective expectation of privacy in the object of the challenged

---

[14] *Id.* at 12-13.

[15] U.S. Const. amend IV; Del. Const. art. I, § 6.

8

search,' and 'society [is] willing to recognize that expectation as reasonable.'"[16] This test derives from Justice Harlan's concurrence in *Katz v. United States*,[17] a case in which the majority found that the government violated the defendant's Fourth Amendment rights by installing an electronic listening device on a public telephone booth and recording the defendant's calls—actions that produced evidence leading to the defendant's conviction. Though the majority stressed that "the Fourth Amendment protects people, not places,"[18] Justice Harlan nonetheless observed that determining "what protection [the Fourth Amendment] affords to those people" whom it protects "requires reference to a 'place'"— *i.e.*, evaluation of whether, by intruding on the place in question, the government could be said to have conducted a "search" that is "presumptively unreasonable in the absence of a search warrant."[19] Justice Harlan observed that "there is a twofold requirement" for an intrusion on a particular place to qualify as a search—"first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'"[20] And Justice Harlan explained that, as

---

[16] *Kyllo v. United States*, 533 U.S. 27, 33 (2001) (quoting *California v. Ciraolo*, 476 U.S. 207 (1986)) (applying the Fourth Amendment). Similarly, standing to challenge government action as an unconstitutional search depends on "whether the person . . . has a legitimate expectation of privacy in the invaded place." *Hanna v. State*, 591 A.2d 158, 163 (Del. 1991) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). "A subjectively held expectation of privacy is legitimate if it is 'one that society is prepared to recognize as reasonable.'" *Id.* (quoting *Rakas*, 439 U.S. at 143-44 n.12). This test also applies to challenges to searches under Delaware law. *See id.* at 164.

[17] 389 U.S. 347 (1967).

[18] *Id.* at 351.

[19] *Id.* at 361 (Harlan, J., concurring).

[20] *Id.* ("Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited. On the other hand, conversations in the

applied to the placement of the listening device on the public telephone booth, the "critical fact" was that:

> '[o]ne who occupies it, (a telephone booth) shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume' that his conversation is not being intercepted. The point is not that the booth is 'accessible to the public' at other times, but that it is a temporarily private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable. [21]

Both Justice Harlan and the majority observed that, in contrast, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." [22]

Although Delaware courts have not confronted whether law enforcement officers violate the United States Constitution or the Delaware Constitution by monitoring information that people make accessible to them when they are undercover, or to other Facebook "friends" who are cooperating with law enforcement, cases from other jurisdictions suggest that a Facebook user does not have a reasonable expectation that information that he shares online with his "friends" will not be revealed by them. [23]

___

open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable.").

[21] *Id.* (quoting majority opinion at 352, then 351).

[22] *Id.* at 351 (majority opinion); *id.* at 361 (Harlan, J., concurring).

[23] *See, e.g.*, *Palmieri v. United States*, 72 F. Supp. 3d 191, 210 (D.D.C. 2014) (holding that "when a Facebook user allows 'friends' to view his information, the Government may access that information through an individual who is a 'friend' without violating the Fourth Amendment" because those friends "'were free to use the information however they wanted—including sharing it with the Government'" (quoting *United States v. Meregildo*, 883 F. Supp. 2d 523, 527 (S.D.N.Y. 2012))); *Meregildo*, 883 F. Supp. 2d at 526 ("[Defendant's] legitimate expectation of privacy ended when he disseminated posts to his 'friends' because those 'friends' were free to use the information however they wanted—including sharing it with the Government.").

A few federal courts have addressed similar scenarios. In *United States v. Meregildo*,[24] the government officers viewed the defendant's Facebook profile through the Facebook account of one of his "friends," who was a cooperating witness. The officers learned that the defendant had posted violent messages and threats online, and that information "formed the core of the Government's evidence of probable cause supporting its application for the search warrant."[25] The defendant alleged a Fourth Amendment violation given that he "undoubtedly believed that his Facebook profile would not be shared with law enforcement."[26] The court acknowledged the defendant's impression but nonetheless found that the defendant "had no justifiable expectation that his 'friends' would keep his profile private" because "those 'friends' were free to use the information however they wanted—including sharing it with the Government."[27] Thus, the court found that the government did not violate the Fourth Amendment in obtaining information through the "friend."[28]

In *United States v. Gatson*,[29] the defendant accepted an Instagram friend request from an undercover account operated by officers, which allowed the officers to see the defendant's photos and other information. The defendant filed a motion to suppress the

---

[24] 883 F. Supp. 2d 523 (S.D.N.Y 2012).

[25] *Id*. at 526.

[26] *Id*.

[27] *Id.*

[28] *Id*. ("When [the defendant] posted to his Facebook profile and then shared those posts with his 'friends,' he did so at his peril.").

[29] 2014 WL 7182275 (D.N.J. Dec. 16, 2014).

evidence obtained from his Instagram page arguing "that there was no probable cause to search and seize items" on his Instagram account.[30] The court denied the motion, holding that, "[n]o search warrant is required for the consensual sharing of this type of information."[31]

*Meregildo* and *Gatson* reach the same conclusion, but frame the issue slightly differently—and these approaches reflect the two major ways courts have viewed these fact patterns. As in *Meregildo*, some courts view this issue as follows: by making information available to "B," "A" misplaced his trust in B because B could always give A's information to law enforcement. These courts find that, by trusting B, A took a risk that B would reveal his information to law enforcement and thus could never have had a reasonable expectation of privacy.[32] Others (*i.e.*, *Gatson*) frame the situation as such: by

---

[30] *Id*. at *22.

[31] *Id*. (citing *United States v. Meregildo*, 883 F. Supp. 2d 523 (S.D.N.Y. 2012)).

[32] *See* K. Brennan-Marquez, *Fourth Amendment Fiduciaries*, 84 Fordham L. Rev. 611, 611 (2015) ("Under existing law, if A shares information with B, A runs the risk of 'misplaced trust'--the risk that B will disclose the information to law enforcement"); *see also United States v. Miller*, 425 U.S. 435, 443 (1976) ("[T]he Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed."); *United States v. White*, 401 U.S. 745, 749 (1971) ("[H]owever strongly a defendant may trust an apparent colleague, his expectations in this respect are not protected by the Fourth Amendment . . . ."); *Rosario v. Clark Cty. Sch. Dist.*, 2013 WL 3679375, at *6 (D. Nev. July 3, 2013) ("When a person tweets on Twitter to his or her friends, that person takes the risk that the friend will turn the information over to the government." (citing *Meregildo*, 883 F. Supp. 2d at 526)); *United States v. Devers*, 2012 WL 12540235, at *2 (N.D. Okla. Dec. 28, 2012) ("[U]nless the defendants can prove that their [F]acebook accounts contained security settings which prevented anyone from accessing their accounts, this court finds their legitimate expectation of privacy ended when they disseminated posts to their 'friends' because those 'friends' were free to use the information however they wanted–including sharing it with the government.").

12

approving B's access to A's information, A acted at his peril because B could always be a "false friend" or member of law enforcement, and A "consensual[ly] shared" the information with B.[33] These cases acknowledge that A might have had a subjective expectation of privacy, but they seem to suggest that that expectation of privacy was not reasonable given the apparent societal view that the law should not remedy "a wrongdoer's [mistaken] belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." [34] Whereas, in *Katz*, the Supreme Court "held that the Fourth Amendment . . . protected Katz because he 'justifiably relied' upon the privacy of the telephone booth,"[35] one cannot justifiably rely on others to keep evidence of criminal activity from law enforcement. Though *Gatson*'s reference to "consensual" sharing might be read as implying that A consented to B's access to the information in question, no case that we have found addressing this context expressly says that A gave B "consent." Discussion of "consent" would seem to presuppose that B would have otherwise conducted a "search" of

---

[33] *Gatson*, 2014 WL 7182275, at *22.

[34] *Hoffa v. United States*, 385 U.S. 293, 302 (1966).

[35] *Kyllo*, 533 U.S. at 32 (quoting *Katz*, 389 U.S. at 353); *see also Lewis v. United States*, 385 U.S. 206, 210-11 (1966); *On Lee v. United States*, 343 U.S. 747, 753-54 (1952); *United States v. Norman*, 448 F. App'x 895, 896-97 (11th Cir. 2011) ("[E]ven if Norman held a subjectively reasonable expectation of privacy in the shared files on his computer, this expectation was not objectively reasonable.") (finding that defendant had no reasonable expectation of privacy in child pornography contained in a file on his computer accessible to the public via a peer-to-peer file-sharing program"); *cf. Chaney v. Fayette Cty. Pub. Sch. Dist.*, 977 F. Supp. 2d 1308, 1315 (N.D. Ga. 2013) ("Even if she had a subjective expectation of privacy in her Facebook photos, Chaney cannot show that her expectation is legitimate.") (finding that a high school student had no reasonable expectation of privacy in photos that she posted on Facebook that depicted her wearing a bikini).

a constitutionally protected area by viewing such information because "consent" is a way to render that intrusion "reasonable" and therefore constitutional.[36]

Though they do not expressly cite it, the "false friend" cases appear to rely on the logic of *Hoffa v. United States*,[37] which observed that "no interest legitimately protected by the Fourth Amendment is involved" when the defendant invited a cooperating witness who was wearing a wire into his hotel suite where the witness then recorded defendant's incriminating statements.[38] The United States Supreme Court noted that the cooperating witness neither "entered the suite by force or by stealth," nor was he a "surreptitious evesdropper." Rather, the witness "was in the suite by invitation, and every conversation which he heard was either directed at him or knowingly carried on in his presence. The petitioner, in a word, was not relying on the security of the hotel room; he was relying upon his misplaced confidence that [the witness] would not reveal his wrongdoing."[39]

---

[36] *See, e.g.*, Orin S. Kerr, *The Case for the Third-Party Doctrine*, 107 Mich. L. Rev. 561, 589 (2009) ("If government conduct does not violate a reasonable expectation of privacy, it is not a search, whereas if it violates a reasonable expectation of privacy pursuant to consent, it is a search but one that is constitutionally reasonable."); Sherry F. Colb, *What Is A Search Two Conceptual Flaws in Fourth Amendment Doctrine and Some Hints of a Remedy*, 55 Stan. L. Rev. 119, 147 (2002) ("A consent search is a governmental activity that invades a reasonable expectation of privacy, and for which the Fourth Amendment would therefore ordinarily require a warrant. Due to the presence of consent, however, the invasion of privacy is 'reasonable,' notwithstanding the absence of any basis for suspicion or outside authorization. The consent of the person searched thus effectively becomes a substitute for probable cause and a warrant.").

[37] 385 U.S. 293 (1966).

[38] *Id.* at 302; *see also Lewis*, 385 U.S. at 210-11; *On Lee*, 343 U.S. at 753-54.

[39] *Hoffa*, 385 U.S. at 302.

14

Though *Hoffa* preceded *Katz*, *Hoffa* was not overruled by *Katz*.[40]   Following both

*Hoffa* and *Katz*, the United States Supreme Court extended this "third party" doctrine to

find that one has no reasonable expectation of privacy in certain other information given

to third parties, such as records of the telephone numbers one dials (as in *Smith v.

Maryland*)[41] or bank records (as in *United States v. Miller*).[42]   However, the applications

of the *Katz* test in these cases have been the focus of much criticism.[43]   In fact, several

---

[40] *White*, 401 U.S. at 749 (noting that *Hoffa* "was left undisturbed by Katz").

[41] 442 U.S. 735, 742 (1979) (holding that that police did not invade a legitimate expectation of privacy when they used a "pen register," a device that identifies the recipients of a person's telephone calls).

[42] 425 U.S. 435, 443 (1976) (holding that a depositor had no reasonable expectation of privacy in his bank records, and thus no Fourth Amendment search occurred when the government subpoenaed them directly from the bank because "[t]he depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government." (citing *White*, 401 U.S. at 751-52).

[43] *See, e.g.*, 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.7(b) (5th ed. 2012) (critiquing *Smith* by arguing that "[s]uch a crabbed interpretation of the Katz test makes a mockery of the Fourth Amendment.  Under *Smith*, the police may without any cause whatsoever and for whatever purpose they choose uncover private relationships with impunity merely because the telephone company might under *some* circumstances for *certain limited purposes* make a record of such relationships for the company's own use."); *id.* § 2.7(c) ("The result reached in *Miller* is dead wrong, and the Court's woefully inadequate reasoning does great violence to the theory of Fourth Amendment protection the Court had developed in *Katz*."); Susan W. Brenner, *The Fourth Amendment in an Era of Ubiquitous Technology*, 75 Miss. L.J. 1, 68 (2005) ("The problem with this holding [in *Smith*] is that it erroneously assumes Smith had a choice.  In fact, since [Smith] had no way to shield the numbers he dialed from the telephone company, the only choice Smith had to minimize his risk of being observed was to leave home and use a pay phone."); *id.* at 70 ("Essentially, *Smith* presents us with a Hobson's choice:  Embrace technology and surrender privacy in the data it compiles and disseminates or reject technology and thereby prevent the exposure of one's personal data."); Robert Ditzion, *Electronic Surveillance in the Internet Age: The Strange Case of Pen Registers*, 41 Am. Crim. L. Rev. 1321, 1336 (2004) ("The only way that *Smith*'s reasoning based on third-party disclosure could make sense in the Internet age would be an undesirable (and likely factually inaccurate) holding that people have no expectation of any privacy in their Internet communications."); Patricia L. Bellia, *Surveillance Law Through Cyberlaw's Lens*, 72 Geo. Wash. L. Rev. 1375, 1403 (2004) ("The conclusion that *Miller*, *Smith*, and like cases foreclose any claim of an expectation of privacy in communications held by a service provider fails to acknowledge the factual contexts of *Miller* and *Smith* themselves,

state supreme courts, in interpreting their own state laws, have expressly disagreed with those holdings and applied the *Katz* test to find that society recognizes a reasonable or legitimate expectation of privacy in such circumstances.[44] Further, Congress stepped in to grant individuals privacy rights in certain bank records,[45] suggesting that at least Congress believed that the Court took too narrow a view of societal expectations of privacy. The United States Supreme Court itself has since limited the third party doctrine in certain areas to suggest, for example, that one may have a reasonable expectation of privacy in certain types of information shared with certain types of people: in *Ferguson v. City of Charleston*,[46] the Court found that doctors at state hospitals conducted an unreasonable search in violation of the Fourth Amendment by administering a diagnostic test in order to obtain evidence of a patient's criminal drug use for law enforcement purposes where the patient had not consented to the procedure.[47] The Court observed that, "[t]he reasonable

---

as well as the doctrinal and normative underpinnings of those decisions. A broad reading of *Miller* and *Smith* is also fundamentally inconsistent with *Katz*."); *Colb*, *supra* note 36, at 122 ("[T]reating exposure to a limited audience as identical to exposure to the world, means failing to recognize degrees of privacy in the Fourth Amendment context.").

[44] *See, e.g.*, *Com. v. Melilli*, 555 A.2d 1254, 1259 (Pa. 1989) ("Telephone activities are largely of one piece, and efforts to create distinctions between numbers and conversational content are constitutionally untenable in our view."); *State v. Hunt*, 450 A.2d 952, 956 (N.J. 1982) ("It is unrealistic to say that the cloak of privacy has been shed because the telephone company and some of its employees are aware of this information. Telephone calls cannot be made except through the telephone company's property and without payment to it for the service. This disclosure has been necessitated because of the nature of the instrumentality, but more significantly the disclosure has been made for a limited business purpose and not for release to other persons for other reasons. The toll billing record is a part of the privacy package."); *see also* 1 LaFave, *supra* note 43, § 2.7(c) (arguing that people have a legitimate expectation of privacy in telephone and bank records).

[45] *See* Right to Financial Privacy Act, 12 U.S.C. §§ 3401-22 (2012).

[46] 532 U.S. 67 (2001).

[47] *Id.* at 78.

expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared with nonmedical personnel without her consent."[48]  Scholars have proposed a further limitation on the third-party doctrine to cover information shared with so-called "information fiduciaries"—a "counterparty to whom we entrust 'personal [or] sensitive information' today, and who, because they occupy a status 'analogous to . . . traditional . . . fiduciaries,' are obligated to use that information in ways that benefit us (or at least, that don't work to our detriment)."[49] Moreover,  even the Supreme Court itself has questioned how far the third-party doctrine

---

[48] *Id.  But see California v. Greenwood*, 486 U.S. 35, 40-41 (1988) (holding that the Fourth Amendment did not prohibit a warrantless search and seizure of garbage left for collection outside the curtilage of a home, and concluding that "having deposited their garbage 'in an area particularly suited for public inspection . . . ,' respondents could have had no reasonable expectation of privacy in the inculpatory items that they discarded." (quoting *United States v. Reicherter*, 647 F.2d 397, 399 (3d Cir. 1981))).  *See also Bond v. United States*, 529 U.S. 334, 338-39 (2000) (applying *Katz* test and citing *Smith*, 443 U.S. at 740) (observing that a bus passenger who places his bag in an overhead been necessarily exposes it to third parties, such as other passengers or bus employees, who "may move it for one reason for another" such as in order to fit other luggage, but "[h]e does not expect that other passengers or bus employees will, as a matter of course, feel the bag in an exploratory manner," and therefore holding that "the agent's physical manipulation of petitioner's bag violated the Fourth Amendment.").

[49] *See* Brennan-Marquez, *supra* note 32, at 649 (quoting Jack Balkin, *Information Fiduciaries in the Digital Age*, Balkinization (Mar. 5, 2014, 4:50 PM), http://balkin.blogspot.com/2014/03/ information-fiduciaries-in-digital-age.html [http://perma.cc/VN5D-JBZP]); *see also* Jack Balkin, *Information Fiduciaries and the First Amendment*, 49 U.C. Davis. L. Rev. 1130-31 ("We provide lots of information about ourselves — some of it quite sensitive — to people and organizations who owe us fiduciary duties or duties of confidentiality. And when we provide this information, we have, and should have, a reasonable expectation that they will respect our privacy. We have a reasonable expectation that disclosing this information to them, or allowing them to collect it from us, is not the same as making the information available to the public generally. . . . If I am right that new digital online service providers may be new kinds of information fiduciaries, then we should have reasonable expectations of privacy in at least some of the information about ourselves that we share with them."); *see also* Richard A. Posner, Privacy, Surveillance, and Law, 75 U. Chi. L. Rev. 245, 248 (2008) ("[A] person would have to be a hermit to be able to function in our society without voluntarily disclosing a vast amount of personal information to a vast array of public and private demanders.").

should be carried in this digital era and speculated that a more nuanced approach might be

needed to address the complexities posed by modern technology.[50]

Though Fourth Amendment jurisprudence is in flux as courts try to apply it to new

technologies,[51] the United States Supreme Court recently has affirmed, in *Byrd v. United*

*States*, that, in order for there to be a Fourth Amendment violation, the complainant must

have had a "property interest" *or* "reasonable expectation of privacy" under the *Katz* test

---

[50] *See, e.g.*, *United States v. Jones*, 565 U.S. 400, 417 (2012) (Sotomayor, J., concurring) (noting that the "third-party doctrine" is "ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks" and that "it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties."); *see also Riley v. California*, 134 S. Ct. 2473, 2491 (2014) (observing that, "[t]o further complicate the scope of the privacy interests at stake [in cell phone searches], the data a user views on many modern cell phones may not in fact be stored on the device itself," that "[c]loud computing is the capacity of Internet-connected devices to display data stored on remote servers rather than on the device itself," and that "[c]ell phone users often may not know whether particular information is stored on the device or in the cloud, and it generally makes little difference."); *City of Ontario, Cal. v. Quon*, 560 U.S. 746, 759 (2010) ("The Court must proceed with care when considering the whole concept of privacy expectations in communications made on electronic equipment owned by a government employer. The judiciary risks error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear."); *Kyllo*, 533 U.S. at 33-34 ("It would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology.").

[51] In fact, the United States Supreme Court is currently considering whether the Fourth Amendment requires the government to obtain a warrant before accessing from third-party service providers "historical cell phone records revealing the location and movements of a cell phone user over the course of 127 days . . . ." *See* Brief for Petitioner at i., *Carpenter v. United States*, No. 16-402 (U.S. Aug. 7, 2017), http://www.scotusblog.com/wp-content/uploads/2017/08/16-402-ts.pdf. In that case, officers obtained Carpenter's cell site location information (CSLI)—data that revealed his location at nearly every moment over a four-month period—from his cellular service providers, MetroPCS and Sprint, pursuant to a court order (not a warrant) under the Stored Communications Act, 18 U.S.C. § 2703(d), based on a standard that was less than probable cause. *See id.* at 2, 5-6, 13. Carpenter argued before the Court that accessing long-term CSLI is a "search" that requires a warrant based on probable cause because the possibility that government officers might access that data based on less than probable cause intruded on citizens' reasonable expectation of privacy, even though that information was held by a third party. *See id.* at 14-15.

in the area where the Fourth Amendment violation is alleged to have occurred.[52]  Justice Thomas wrote separately in *Byrd* to express his "serious doubts about the 'reasonable expectation of privacy' test from *Katz*."  But even he (joined by Justice Gorsuch) joined the Court's opinion because "it correctly navigates our precedents, which no party has asked us to reconsider."[53]

Here, we need not explore the edges and boundary lines defining a person's legitimate expectation of privacy in information shared with third parties such as Internet providers or social media platforms such as Facebook, Twitter, and Snapchat.  Rather, we resolve the case on narrow grounds—namely, that the Fourth Amendment does not guard against the risk that the person from whom one accepts a "friend request" and to whom one voluntary disclosed such information might turn out to be an undercover officer or a "false friend."  One cannot reasonably believe that such "false friends" will not disclose incriminating statements or information to law enforcement—and acts under the risk that one such person might actually be an undercover government agent.  And thus, one does not have a reasonable expectation of privacy in incriminating information shared with them

---

[52] *Byrd v. United States*, No. 16-1371, --- S. Ct. ----, 2018 WL 2186175, at *6-7 (U.S. May 14, 2018) ("Indeed, more recent Fourth Amendment cases have clarified that the test most often associated with legitimate expectations of privacy, which was derived from the second Justice Harlan's concurrence in *Katz v. United States*, 389 U.S. 347 (1967), supplements, rather than displaces, 'the traditional property-based understanding of the Fourth Amendment.'" (quoting *Florida v. Jardines*, 569 U.S. 1, 11 (2013))).

[53] *Id.* at *12 (Thomas, J., concurring).

because that is not an expectation that the United States Supreme Court has said that society is prepared to recognize as reasonable.[54]

To be clear, there are prohibitions against wiretapping conversations as they are happening absent a court order.[55] And the privacy of emails or the servers where they are stored is not at issue. We only hold that, as between Everett and his "false friend," the undercover Detective Landis, Everett assumed the risk that whoever was behind that account was a law enforcement officer, and, thus, there was no reasonable expectation of privacy that shields the incriminating information he shared.

Finally, Everett argues that Detective Landis must have had reasonable suspicion of criminal activity before resorting to "ruse, fabrication, or deception" in obtaining his

---

[54] Our holding under the Delaware Constitution is similarly limited. Our Article I, Section 6 is broader than the Fourth Amendment. *See, e.g.*, *Jones v. State*, 745 A.2d 856, 866 (Del. 1999) (recognizing that the Pennsylvania Supreme Court found that the search and seizure provision in Pennsylvania Constitution's "reflected *different* and *broader* protections than those guaranteed by the Fourth Amendment" and determining that "[w]e reach the same conclusion with regard to the search and seizure provision in the Delaware Constitution based upon its historical convergence for more than two hundred years with the same provision in the Pennsylvania Constitution."); *see also Wheeler v. State*, 135 A.3d 282, 298 n.71 (Del. 2016) (noting "three cases in which this Court held that our State Constitution provides somewhat broader constitutional protections."). We do not foreclose the possibility that this Court might conclude that, as to other issues that might arise in this developing area of search and seizure law, our State Constitution is more protective of those rights than the Fourth Amendment.

[55] *See* Clifford S. Fishman & Anne T. McKenna, *Wiretapping and Eavesdropping* § 1:10 ("Title III [of the Omnibus Crime Control and Safe Streets Act of 1968, P.L. No. 90-351, 82 Stat. 197, 211 (1968), codified at 18 U.S.C. §§ 2510 et seq.] is a detailed legislative scheme which specifies who may authorize an investigator to apply for a court order, the information an application must contain and the findings a judge must make before issuing the order, how the order is to be executed, how recordings of intercepted conversations are to be secured, who must eventually receive notice that phone or other communications facility was tapped or a location was bugged, and a host of other details."); 11 *Del. C.* § 2402(c)(3) (authorizing government wiretapping for limited investigative purposes only after obtaining a Superior Court order under § 2407); 11 *Del. C.* § 2407(c)(1)(a)-(d) (providing that a judge may issue an ex parte order "authorizing interception of wire, oral or electronic communications" only if certain requirements are satisfied).

20

consent in order for that consent to be considered valid. In *Hoffa v. United States*, "[t]he argument [was] that [the informant's] failure to disclose his role as a government informant vitiated the consent that the petitioner gave" for the agent's access to criminal wrongdoing.[56] But the United States Supreme Court rejected that argument recognizing that, "[t]he Fourth Amendment does not protect 'a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.'"[57] If one allows others to have access to his or her information that contains evidence of criminal wrongdoing, then that person assumes the risk that they might expose that information to

---

[56] *Hoffa*, 385 U.S. at 300.

[57] *Henry v. State*, 945 A.2d 594, 2008 WL 623208, at *3 n.16 (Del. 2008) (TABLE) (quoting *United States v.* Lee, 359 F.3d 194, 199-200 (3d Cir. 2004) (quoting *Hoffa*, 385 U.S. at 302)); *see also Lewis v. United States*, 385 U.S. 206, 209 (1996) ("[I]n the detection of many types of crime, the Government is entitled to use decoys and to conceal the identity of its agents," but noting that "[t]he various protections of the Bill of Rights, of course, provide checks upon such official deception for the protection of the individual."); *see Schneckloth v. Bustamonte*, 412 U.S. 218, 241 (1973) ("There is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment. Nothing, either in the purposes behind requiring a 'knowing' and 'intelligent' waiver of trial rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and seizures."); *Colb*, *supra* note 36, at 149 ("[A] lack of information that would vitiate a waiver does not categorically invalidate consent."); *Illinois v. Rodriguez*, 497 U.S. 177, 187 (1990) ("[W]hat is at issue when a claim of apparent consent is raised is not whether the right to be free of searches has been *waived,* but whether the right to be free of *unreasonable* searches has been *violated.*"); *United States v. Longoria*, 177 F. 3d 1179, 1183 n.2 (10th Cir. 1999) (stating that, "[i]f a defendant . . . knowingly exposes his conversation to accomplices, even in a room not accessible to the general public, his conversations are not subject to Fourth Amendment protection from disclosure by such accomplices," and that, defendant "had no reasonable expectation that the person in whose presence he conducts conversations will not reveal those conversations to others."); *Pennell v. State*, 602 A.2d 48, 54 (Del. 1991) (rejecting the defendant's argument that an officer was not legally in a position to view evidence in plain view because, even though the defendant believed that the officer was a prostitute, the defendant invited the officer to approach and enter the defendant's van) (citing *Lewis*, 385 U.S. at 210-12).

law enforcement—or they might be undercover officers themselves.[58] As the United States Supreme Court has put it, "[t]he risk of being . . . betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society" and "is the kind of risk we necessarily assume whenever we speak."[59] In *United States v. White*,[60] a plurality of the United States Supreme Court followed *Hoffa* and similarly observed that, "[i]f the law gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent, neither should it protect him when that same agent has recorded or transmitted the conversations which are later offered in evidence to prove the State's case."[61]

---

[58] *See, e.g.*, *Palmieri*, 72 F. Supp. 3d at 210 ("When a Facebook user allows 'friends' to view his information, the Government may access that information through an individual who is a 'friend' without violating the Fourth Amendment."). In addition, Detective Landis was aware that Everett was a person prohibited from possessing deadly weapons due to violent felony convictions. Although our holding here need not rely upon this fact, the special nature of probationary supervision results in curtailed rights of a probationer as compared to those of an ordinary citizen. *See Fuller v. State*, 844 A.2d 290, 291 (Del. 2004); *see also Griffin v. Wisconsin*, 483 U.S. 868, 873-74, 880 (1987) (holding that a warrantless search of a probationer's home was "reasonable" within the meaning of the Fourth Amendment, and noting that the special nature of probationary supervision justified a departure from the usual warrant and probable cause requirements for a search); *McAllister v. State*, 807 A.2d 1119, 1124 (Del. 2002) ("As the United States Supreme Court has observed, 'inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled.'" (quoting *Griffin*, 483 U.S. at 874)).

[59] *Hoffa*, 385 U.S. at 303 (quoting *Lopez v. United States*, 373 U.S. 427, 465 (1963) (Brennan, J., dissenting)).

[60] 401 U.S. 745 (1971).

[61] *Id.* at 752. In *White*, the plurality found no Fourth Amendment violation where a radio transmitter was concealed on the informant's body, and police then monitored the informant's conversations with the defendant, including one that occurred in the defendant's home. *See also Lopez v. United States*, 373 U.S. 427, 439 (1963) (finding no Fourth Amendment violation where an undercover officer gained entry into the defendant's office with his consent and then recorded his conversations with the defendant because "[t]he Government did not use an electronic device to listen in on conversations it could not otherwise have heard. Instead, the device was used only to obtain the most reliable evidence possible of a conversation in which the Government's own agent was a participant and which that agent was fully entitled to disclose."); *United States v. Lee*,

In sum, we agree with the trial court's conclusion that the Detective's viewing of Everett's Facebook page did not violate the Fourth Amendment or Article I, Section 6 of the Delaware Constitution.

### D.     Conclusion

For the reasons set forth above, we AFFIRM.

---

359 F.3d 194, 203 (3d Cir. 2004) (finding no Fourth Amendment violation where officers videotaped defendant's conversations with an informant in the defendant's hotel suite with a camera that they had installed before defendant occupied the room); *United States v. Myers*, 692 F.2d 823, 859 (2d Cir. 1982) ("[Defendant's] conversations with undercover agents in whom he chose to confide were not privileged, and mechanical recordings of the sights and sounds to which the agents could have testified were proper evidence." (citing *White*, 401 U.S. at 749-53)).