# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| **STATE OF DELAWARE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ID No. 2004003492** |
| v. | ) | |
| | ) | |
| **SHUAKA M. BRISCOE**, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: November 17, 2021
Decided: November 30, 2021

## <u>OPINION AND ORDER ON DEFENDANT'S</u>
## <u>MOTION TO SUPPRESS: DENIED</u>

*Matthew C. Keating, Deputy Attorney General*, Wilmington, Delaware, Attorney for the State of Delaware

*John S. Malik, Esquire*, Wilmington, Delaware, Attorney for Defendant.

Jones, J.

Defendant, Shuaka M. Briscoe ("Briscoe") has filed a Motion to Suppress to challenge the admissibility of evidence resulting from a search of his person, his vehicle, and the vehicle he was detained in, as well as any and all statements made by him in response to custodial interrogation and processing. For the reasons that follow, Defendant's Motion to Suppress is DENIED.

There is no dispute that on April 21, 2021, around 9:30 PM, Safe Street Officers Gaetan MacNamara ("MacNamara"), Matthew Rosiao ("Rosiao"), and Sean Nolan ("Nolan") of the Wilmington Police Department and SPO Joseph Scioli ("Scioli") of Probation and Parole found Shuaka Briscoe ("Briscoe") sitting in the front passenger seat of a white, Chevrolet Cruze with a dark/black color interior, parked on east 17th Street. The officers approached the vehicle and viewed Briscoe wearing a camouflage jacket. There was another occupant in the vehicle, Seth Briscoe, who was in the driver's seat. Upon making contact with the vehicle, officers immediately detected the odor of marijuana and smoke emanating from the car. Both Briscoe and the other occupant, Seth Briscoe, were removed from the vehicle and the latter admitted to smoking marijuana in the vehicle.

It is also undisputed that the officers had knowledge that Briscoe was previously convicted of Possession of a Narcotic Schedule 1 Controlled Substance within 1,000 feet of a School in 2010, which prohibits Briscoe from possessing a firearm. Prior to making contact with Briscoe, the officers determined that Briscoe

2

had a pending summons for a violation of probation, for failure to complete a court-ordered course addressing a conviction for Driving Under the Influence. This conviction would revoke Briscoe's license or driving privileges until he completed a DUI "Treatment Program" pursuant to 21 *Del. C.* §2732(3).

It is not contested that MacNamara then conducted a search of Briscoe which produced a key. The key was to an unoccupied, Chevrolet Malibu, dark in color, which was also parked on the same block, about 25 feet away from the white Chevrolet Cruz. Prior to this contact with police, months prior, Briscoe had been arrested for disregarding a Police Signal and multiple traffic charges. The dark in color Chevy Malibu matched the car that fled from the police in those circumstances. Scioli went to the Chevy Malibu because, based on his training and experience, he knew individuals would likely put drugs and/or firearms in a near-by car so that they would go undetected, otherwise known as a "stash car." He shined his flashlight into the interior of the car and determined that the center console of the Malibu was consistent with the console displayed in the picture shown to the officers which was provided by a confidential information and where Briscoe was also holding a gun. (See below). Scioli inserted the key into the Malibu, and it fit the vehicle's lock. At this point, Scioli contacted his supervisor to get permission to search the vehicle by way of an administrative warrant.

There is no dispute that at the scene of the incident, SPO Scioli of Probation and Parole was with the officers and obtained an administrative warrant to search the two vehicles after discussion with his supervisor. Both vehicles were transported to Wilmington Police Department and searched. The search revealed one (1) black Glock 22 with an extended magazine, two (2) 19 rounds of ammunition with the magazine with an additional round in the gun's chamber, one (1) bag of cocaine, four (4) small bags of marijuana, a wallet with Briscoe's driver's license and paperwork displaying Briscoe's name. The previous items were discovered in the Malibu, and in the Cruze, three (2) bags of suspected marijuana were discovered.

There is no question that Briscoe himself was also searched incident to arrest at the police station. During the search, officers discovered another bag of suspected cocaine. After this discovery, Briscoe made the following statement to officers, "y'all finally got me."

What is factually disputed is how the officers arrived at east 17th Street on the night in question. According to the State, on April 21, 2021, during roll call between 6:00 and 7:00 pm that evening, Officers MacNamara and Rosiao were informed by a past-proven, reliable, confidential informant ("CI") that Briscoe was in possession of a firearm. The CI texted a picture of Briscoe to both MacNamara and Rosiao and the text said that Briscoe had posted to his social media account. In the picture, Briscoe is holding a black in color, Glock handgun with an extended magazine,

4

sitting in what appeared to be a motor vehicle with gray interior. Briscoe appeared to have his arm on top of a gray armrest, presumed to be a center console. The CI additionally informed the officers through text that Briscoe is frequently "up north." Officers, based on their own personal knowledge and experience with Briscoe, knew he was frequently in the area of the 900 block on East 17th Street in Wilmington, Delaware, in the northern part of the city. MacNamara accessed Briscoe's Instagram account and discovered on the account the same picture that the CI had texted to both Rosiao and MacNamara.

According to Briscoe, a confidential informant did not provide the information that led the officers to east 17th Street on the night in question. According to Briscoe, law enforcement were covertly monitoring Briscoe's activity on social media and it was as a result of this covert monitoring that law enforcement saw the picture with Briscoe holding a gun and led to the chain of events described above.

## STANDARD OF REVIEW

On a Motion to Suppress evidence in a *warrantless* search or seizure, the burden of proof lies with the State. A search occurs only where "the individual manifested a subjective expectation of privacy in the object of the challenged

search," and that expectation is one "society [is] willing to recognize … as reasonable."[1]

Where an individual is on probation, Delaware requires only that probation officers have reasonable grounds to conduct an administrative search of a probationer's home.[2] This is true even though probation officers may not follow every technical requirement of the Department of Corrections search and seizure regulations.[3] "The special nature of probationary supervision justifies a departure from the usual warrant and probable cause requirements for searches, but a search of a probationer's home must be reasonable."[4] Reasonable suspicion exists where, based on the totality of the circumstances, a probation officer has a "particularized and objective basis for suspecting legal wrongdoing."[5]

Where officers receive an anonymous tip regarding a probationer's involvement in criminal activity, probation officers must follow the proper procedures, specifically Procedure 7.19. Procedure 7.19 requires that the probation officer "assess independently the reliability of the information provided to them."[6] In *Culver v. State*, the Delaware Supreme Court held that:

> Procedure 7.19 makes it plain that probation officers must rationally assess the facts made known to them before reaching the critical

---

[1] *Everett v. State*, 186 A.3d 1224, 1229 (Del. 2018).
[2] *Culver v. State*, 956 A.2d 5, 11 (Del. 2008).
[3] *Id.*
[4] *Id.*
[5] *Sierra v. State*, 958 A.2d 825, 828 (Del. 2008).
[6] *Culver*, 956 A.2d at 7.

conclusion that there is a reasonable basis to search a probationer's dwelling. Procedure 7.19 specifically requires:

> In evaluating reliability of information, was the information detailed, consistent, was the informant reliable in the past, and consider the reason why the informant is supplying information.[7]

The totality of the circumstances is also considered in determining whether a confidential informant's tip is enough to satisfy a showing of reasonable suspicion and the informant's credibility, reliability and basis of knowledge are key to this analysis.[8]

## ANALYSIS

## THE CONSTITUTIONAL CHALLENGE

Briscoe contends that law enforcement found out about the gun by covertly monitoring his social media account, and that such covert monitoring violates the Fourth Amendment to the United States Constitution and Article I, Section 6 of the Delaware Constitution. Specifically, Briscoe advances that such covert monitoring violates the reasonable expectation of privacy in social media posts.

The first factual question that this Court must resolve is whether law enforcement was covertly monitoring Briscoe's activity on social media or whether a confidential informant provided the picture at issue here to the officers.

---

[7] *Id.* at 10.
[8] *Sierra*, 958 A.2d at 829.

Based on the record developed, this Court finds by a preponderance of the evidence that a CI, who was past proven and reliable, was involved in the case and that it was the information of the CI that led law enforcement to Briscoe. The argument that covert monitoring by law enforcement was involved in this case is just that – an argument. There is simply no credible evidence to support Briscoe's assertion of covert monitoring. Having reached this factual conclusion, this Court finds that Briscoe's expectation of privacy argument is controlled by the Delaware Supreme Court's decision in *Everett v. State*.[9]

In *Everett*, the Court concluded that the defendant had no expectation of privacy in a picture he posted to social media.[10] A detective had used the picture to obtain a search warrant to search the defendant's residence.[11] The detective in *Everett* monitored the defendant's Facebook profile for approximately two years by creating a fake name and profile and sending a "friend request" to the defendant.[12] The defendant accepted the "friend request" and the detective was able to see the defendant's posts.[13] The detective observed a picture posted by the defendant of a nightstand with a handgun, a Mercedes car key, a large amount of cash, a pay stub, two cell phones, and a framed photograph of the defendant wearing a black T-shirt

---

[9] 186 A.3d 1224 (Del. 2018).
[10] *Id.* at 1236.
[11] *Id.* at 1225.
[12] *Id.*
[13] *Id.*

and a red necklace.[14] The defendant himself was not in the picture.[15] A search warrant was obtained by the officer based on the picture posted on defendant's social media and the officer's own independent investigation to corroborate the picture.[16]

The defendant claimed that the monitoring of his Facebook account by the officer was a violation of his constitutional rights.[17] In evaluating this argument, the Court employed a two-step analysis.[18] First, the Court considered whether the monitoring violated the Delaware or United States Constitution.[19] The Court found that it had not and its analysis concluded.[20] The Court concluded that the defendant did not have a reasonable expectation of privacy in his social media post because he voluntarily shared it with his "friends," including the officer's fake profile.[21]

The *Everett* Court recognized that Delaware had not yet confronted this issue, but cited to cases from other jurisdictions as well as federal cases to support its conclusion, which was:

> We resolve the case on narrow grounds – namely, that the Fourth Amendment does not guard against the risk that the person from whom a "friend request" and to whom one voluntary[il]y disclosed such information might turn out to be an undercover officer or a "false friend." One cannot reasonably believe that such "false friends" will not disclose incriminating statements or information to law

---

[14] *Id.* at 1226.
[15] 186 A.3d at 1226.
[16] *Id.*
[17] *Id.* at 1227-28.
[18] *Id.* at 1228.
[19] *Id.*
[20] *Id.* The second prong of the Court's two-step analysis is not relevant for the purposes of the instant matter because it relates to making a determination as to whether there was probable cause for the search warrant, absent the tainted evidence, and the search at issue here was warrantless.
[21] 186 A.3d 1229.

enforcement – and acts under the risk that one such person might actually be an undercover government agent. And thus, one does not have a reasonable expectation of privacy in incriminating information shared with them because that is not an expectation that the United States Supreme Court has said that society is prepared to recognize as reasonable.[22]

As the defendant in *Everett* did, Briscoe himself posted a picture of himself holding a gun to his social media account. As such, he "assumed the risk that one of [his friends] might be a government officer or share his information with law enforcement."[23] Here, one of Briscoe's "friends" shared his social media post with Officers MacNamara and Rosiao. Officer MacNamara was also able to independently view Briscoe's Instagram account and confirmed that the picture was, in fact, on the account. In applying the framework employed by the Court in *Everett*, this Court does not need to go further than the first prong as it finds that Briscoe did not have a reasonable expectation of privacy in his social media because he voluntarily shared it with his "friends." MacNamara was able to corroborate the information provided by the CI by viewing the picture on Briscoe's social media himself. MacNamara testified that he did not remember whether Briscoe's account was public or whether he requested to be Briscoe's "friend" in the past. Regardless, Briscoe either voluntarily made the decision to have his account viewed by the

---

[22] *Id.* at 1236.
[23] *Id.*

public, or to grant MacNamara access to his account by "accepting his friend request."[24]

Boscoe also relies on *Carpenter v. United States*,[25] a United States Supreme Court decision decided shortly after *Everett*, in support of his argument that he had a reasonable expectation of privacy in his social media post. In *Carpenter*, the issue before the Court was "whether the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records location that provide a comprehensive chronicle of the user's past movements[,]" or cell-site location information (CSLI).[26] The Court held that such a search is a violation of a person's constitutional rights. "A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales."[27] The Court expressed that this posed a greater privacy concern than GPS tracking it addressed in another decision.[28] The Court also, as to CSLI, rejected the third-party doctrine or "voluntary exposure" noting that CSLI "is not truly 'shared' as one normally understands the term."[29] The Court reasoned that absent a person disconnecting from a network, "there is no way

---

[24] MacNamara testified if he had requested access to the account, the account would not have displayed his personal name. However, this does not change this Court's decision being that in *Everett* the officer there also created a fake profile, using a fake name and profile picture. The Court nonetheless concluded that there was no violation of the defendant's reasonable expectation of privacy. *Everett*, 186 A.3d at 1225.

[25] 138 S.Ct. 2206 (2018).

[26] *Id.* at 2211.

[27] *Id.* at 2218 (internal citations omitted).

[28] *Id.*

[29] *Id.* at 2220.

to avoid leaving behind a trial of location data. As a result, in no meaningful sense does the user voluntarily 'assume [] the risk' of turning over a comprehensive dossier of his physical movements."[30]

Both *Everett* and *Carpenter* address information that a person chooses to share with others via social media. The picture at issue here is not information that a business collected without Briscoe's knowledge or intent to use. Briscoe, on his own volition, made the post. What Briscoe chooses to post, when to post, and who can view it, are all decisions he makes on his own accord. Briscoe made the conscious decision to take the picture, post the picture on his social media account, and allow others to view the picture. In short, *Carpenter* does not overrule the *Everett* decision and *Everett* is controlling.[31]

Finally, Briscoe argues that the adoption of 11 *Del. C.* § 1335(a)(9)(b) evidences an expectation of privacy of shared photos or videos. Section § 1335 provides that a person who has consented to the capture or possession of a visual depiction of nudity or sexual conduct "retains a reasonable expectation of privacy with regard to the reproduction, distribution, exhibition, publication, transmission or other dissemination of that depiction, even if another person possesses a copy of the

---

[30] *Id.* (internal citations omitted).
[31] Briscoe also cites to *United States v. Chavez*, 423 F.Supp.3d 194 (W.D.N.C. 2019), a case decided by the Western district of North Carolina, in support of his position. This Court finds that *Chavez* is inconsistent with *Everett*, and because *Everett* was decided by this State's Supreme Court and the former is merely persuasive authority, this Court chooses not to follow it.

depiction."[32] According to Briscoe, this statute undercuts the rationale in *Everett* that a person who voluntarily posts a picture that friends can see does not have a reasonable expectation that the picture or post will not be disclosed. This Court disagrees. A law that addresses nudity, and the obvious expectation of privacy involved with nudity, lends no support to an argument that there is an expectation of privacy in general social media postings.

Therefore, this Court concludes that *Everett* controls the instant matter and that Briscoe did not have a reasonable expectation of privacy in his social media post. As such, there has been no violation of Briscoe's Fourth Amendment rights or a violation based on an unlawful search and seizure under the Delaware Constitution.

## THE ADMINISTRATIVE SEARCH

Briscoe's second argument for suppression of evidence is that the State cannot make a showing that the police officers and probation officer substantially complied with Delaware statutory law and the Administrative Regulations governing the search of probationers and their property.

Reasonable grounds must exist for probation officers to conduct an administrative search of a probationer's property in which he has a privacy interest.[33] Probation officers are not required to "satisfy each technical requirement of the

---

[32] 11 *Del. C.* § 1335(a)(9)(b).
[33] *Culver v. State*, 956 A.2d 5, 11 (Del. 2008).

13

search and seizure regulations of the Department of Correction."[34] In determining whether a search should be conducted, the Delaware Supreme Court has set forth factors for a probation officer to consider:

> Generally, the following factors should be considered when deciding whether to search: The Officer has knowledge or sufficient reason to believe the offender possesses contraband; The Officer has knowledge or sufficient reason to believe the offender is in violation of probation or parole; There is information from a reliable informant indicating the offender possesses contraband or is violating the law; the information from the informant is corroborated; Approval for the search has been obtained from a Supervisor.[35]

Applying these factors to this case, this Court finds that SPO Scioli had reasonable grounds to conduct an administrative search of Briscoe's vehicle and the vehicle in which he was sitting.

As to the first factor, SPO Scioli had knowledge or sufficient reason to believe that Briscoe possessed contraband. During roll call that evening, Scioli was present when the picture was received from the CI was displayed among the officers. He was also present when MacNamara accessed Briscoe's account and viewed the same picture. The picture depicted Briscoe wearing the same jacket he was wearing at the time of his arrest. SPO Scioli was with officers when they approached Briscoe. When officers approached the vehicle to make contact with Briscoe they

---

[34] *Donald v. State*, 903 A.2d 315 (Del. 2006).
[35] *Sierra v. State*, 958 A.2d 825, 829 (Del. 2008) (citing Delaware Department of Corrections Bureau of Community Corrections Probation and Parole Procedure No. 7.19, § VI.E (amended effective June 5, 2011).

immediately detected the odor of marijuana and smoke emanating from the car. SPO Scioli was further aware that Briscoe's probation prohibited him from using and/or possessing controlled substances. In short, prior to conducting the search, SPO Scioli believed Briscoe to be smoking marijuana in the parked car, which was a misdemeanor and a violation of Briscoe's probation.[36]

As to the second factor, SPO Scioli had knowledge or sufficient reason to believe that Briscoe was in violation of probation. As previously noted, SPO Scioli suspected Briscoe was using and/or possessing marijuana, which his probation prohibited. Scioli's suspicion was based on the odor of marijuana and the smoke emanating from the vehicle when officers made contact with Briscoe and also Seth Briscoe's statement to officers that they were smoking marijuana. Also, SPO Scioli was aware that Briscoe was believed to have posted the picture earlier that day wearing a camouflage jacket, the same one he was wearing when officers made contact with him, while holding a firearm inside a motor vehicle that had a gray console.[37] Scioli was aware that Briscoe possessed a key to a Malibu parked between

---

[36] On this basis alone, a search of Briscoe and the cars was justified. *See State v. Swigget*, 2019 WL 245292 (Del. Super. Ct. 2019).

[37] Briscoe also argues that there is no evidence or testimony establishing when the picture was actually taken or when it was posted. Briscoe argues that without this there was no basis for the administrative search. This Court does not find this argument compelling . There is no requirement that the State must establish the recency of a picture relied upon by law enforcement in making an arrest. Rather, the fact that Briscoe was on Level I probation at the time of his arrest and was found to be in violation of his probation for possessing and/or using contraband – based on the odor and smoke emanating from the vehicle when officers made contact with him – the State must only establish by a preponderance of the evidence that there were reasonable suspicion for the search. Reasonable suspicion is "evaluated in the context of the totality of circumstances to assess whether the detaining officer had a particularized and objective basis to suspect criminal activity." *Jose Lopez-Vazquez v. State of* Delaware, 956 A.2d 1280, 1288 (Del. 2008). The totality of the circumstances of the surrounding situation is "viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an

twenty-five (25) to fifty (50) feet away that had a center console consistent in color and shape as the one in the picture. Scioli was provided that key after MacNamara conducted a search incident to arrest of Briscoe, as it was believed that he had smoked marijuana in violation of his probation. Scioli was also aware that the key in Briscoe's pocket fit the Malibu. Not only did Briscoe's probation prohibit him from possessing and/or using marijuana, but he is also a person prohibited from possessing a firearm due to a prior felony conviction, which Scioli knew.

Briscoe contends that by Scioli putting the key into the Malibu that this constituted a search. This Court does not agree. In *State v. Hall*[38], the defendant was arrested and people came to the police station asking about keys to a vehicle they believed were in the defendant's possession. The defendant denied that he had the keys but an officer observed a set of keys to a Ford on his key chain. The officer took the keys to Kent Apartments to see if there was a vehicle there that matched the keys. The vehicle was located and the officer was able to unlock the vehicle with the key. The officer then relocked the vehicle's door without opening it and waited to receive consent from the owner to conduct a search.[39] This Court concluded that "the insertion of the key into the car door lock was merely for identification purposes and

---

officer's subjective interpretation of those facts." *Id.* Applying this standard, there is no question that based on the totality of the circumstances, Scioli had reasonable suspicion for the search.

[38] 1997 WL 528318, at *2 (Del. Super. Ct. 1997).
[39] *Id.* at 2.

was not a 'search' within the meaning of the Fourth Amendment."[40] Here, SPO Scioli testified that once he put the keys in the Malibu's lock and was able to unlock it, he immediately called his supervisor to obtain permission to conduct an administrative search of the vehicle. Scioli did not enter the vehicle until he obtained the administrative warrant. As such, there was no violation of Briscoe's constitutional rights.

As to the third factor, Scioli was informed by officers that a past-proven confidential informant provided the picture to officers.[41] Scioli was also present when MacNamara viewed the picture on Briscoe's account on his own. This information indicated that Briscoe was in possession of a firearm which his probation prohibits, as well as his prior felony conviction.

As to the fourth factor, the information from the informant was corroborated as Officer MacNamara was also able to view the picture on Briscoe's social media account before making contact with him. Additionally, the informant told officers that Briscoe was frequently "up north," and officers knew, based on their own knowledge and experience with Briscoe, that Briscoe did frequent the area of the 900 block of East 7th Street in Wilmington, Delaware, in the northern section of the

---

[40] *Id.* at 6.

[41] MacNamara and Rosiao both testified to receiving the text from the CI on the day in question. This particular CI had supplied information in the year prior to the events described herein eight (8) to ten (10) times. On three (3) to five (5) of those occasions, the CI's efforts resulted either in arrests or the apprehension of drugs and/or guns. The officers testified that the CI had been paid by them for this information.

city. Briscoe was, in fact, found where the CI said he would be found. All of this information was relayed to SPO Scioli prior to conducting the search.

As to the last factor, SPO Scioli did discuss the details of the investigation with his supervisor and then obtained the administrative search warrant for the two (2) vehicles. Therefore, this Court concludes that SPO Scioli had reasonable grounds to conduct an administrative search of the two (2) vehicles.

Briscoe also argues that SPO Scioli did not comply with Procedure 7.19. Where officers receive an anonymous tip regarding a probationer's involvement in criminal activity, probation officers must follow the proper procedures, specifically Procedure 7.19.[42] Procedure 7.19 requires that the probation officer "assess independently the reliability of the information provided to them."[43] In *Culver v. State*, the Delaware Supreme Court held that:

> Procedure 7.19 makes it plain that probation officers must rationally assess the facts made known to them before reaching the critical conclusion that there is a reasonable basis to search a probationer's dwelling. Procedure 7.19 specifically requires:
>
> > In evaluating reliability of information, was the information detailed, consistent, was the informant reliable in the past, and consider the reason why the informant is supplying information.[44]

---

[42] *Culver*, 956 A.2d at 11.
[43] *Id.*
[44] *Id.* at 11.

18

The totality of the circumstances is also considered in determining whether a confidential informant's tip is enough to satisfy a showing of reasonable suspicion and the informant's credibility, reliability and basis of knowledge are key to this analysis.[45]

This Court does not agree with Briscoe and finds that SPO Scioli did properly comply with Procedure 7.19. The past-proven confidential informant provided the tip to the officers, who then relayed that information to SPO Scioli. Scioli was also present when MacNamara accessed Briscoe's social media account. The informant provided officers a picture of Briscoe that he had posted on his social media account in what appeared to be a motor vehicle with gray  interior, wearing a camouflage jacket, and holding a black in color firearm. The informant also informed police that Briscoe was frequently "up north." When officers and SPO Scioli made contact with Briscoe he was "up north," in a motor vehicle with dark/black color interior, parked on east 17th Street, wearing a camouflage jacket, and an examination of a vehicle parked between twenty-five (25) and fifty (50) feet away unveiled a black Glock 22 with an extended magazine and Briscoe's personal belongings, including his driver's license, were in the car. The key in Briscoe's pocket was the key to this car.

Despite Briscoe's contentions, this Court finds both *Culver v. State* and *Sierra v. State* distinguishable from this case. In *Sierra*, officers received the information

---

[45] *Sierra*, 958 A.2d at 829.

from an unidentified DOH employee, not an informant, that the defendant possessed drugs in his residence.[46] Additionally, there was no evidence about why the CI knew about the drug delivery.[47] Further, there was no indication that the confidential informant was past-proven reliable.[48] And finally, as to why the CI was providing the information the officer testified that "he assume[d] the informant has something to gain by providing the tip," and the Court agreed.[49] The court concluded that the "self-interested top alone was insufficient to establish a basis for a search."[50]

In *Culver*, the Court stated that the information the informant provided was "nothing more than his speculative analysis of traffic patterns in front of Culver's home and the caller's conclusion that those pattens established that drug activity was afoot."[51] Additionally, the officer's continued surveillance of the home provided nothing to corroborate the tip.[52] The information was found to be "neither internally consistent with its own inferred conclusion nor with the later independent investigation undertaken in an attempt to corroborate it."[53] The information that was provided by the caller was merely "observable information."[54] The State also conceded that the informant was not past-proven reliable.[55] Lastly, there was no

---

[46] *Id.* at 831.
[47] *Id.*
[48] *Id.*
[49] *Id.* at 832.
[50] *Id.*
[51] *Culver*, 956 A.2d at 11.
[52] *Id.* at 12.
[53] *Id.*
[54] *Id.*
[55] *Id.*

evidence of the caller's intent in providing the tip.[56] Therefore, the Court concluded that the "the probation officers improperly relied on conclusory, inconsistent, an unreliable information that cannot sustain a reasonable suspicion to search Culver's home."[57]

In the instant matter, all of the following was done prior to the execution of the administrative warrant. Officers MacNamara and Rosiao and SPO Scioli relied on information they were given from a CI, not a third-party intermediary. The information was verified by accessing Briscoe's social media account. Additionally, they described the CI as a past-proven confidential informant. The picture provided to officers by the CI included illegal activity because of Briscoe's status as a person prohibited from possessing a firearm due to a felony conviction and was not merely "observable information." The officers were able to corroborate the information provided to them by the CI – the location of Briscoe in the northern part of the city, as well as Officer MacNamara viewing the post himself. Officers were also able to identity Briscoe based on their prior interactions with him as the person in the social media post. When officers made contact with Briscoe he was wearing the same camouflage jacket he was wearing in the picture. Officers were able to compare the interior of the car in the picture with the interior of the vehicle, including the one

---

[56] *Id.* at 13.
[57] *Culver*, 956 A.2d at 14.

Briscoe was in at the time officers made contact and the Malibu parked on the same street and determine that the interior of the Malibu was consistent with the picture.

Based on the foregoing, this Court concludes that SPO Scioli properly followed Procedure 7.19, and therefore there was a reasonable basis to conduct the searches of the two (2) vehicles.

**WHEREFORE**, for all the reasons stated herein, the Defendant's Motion to Suppress is **DENIED**.

**IT IS SO ORDERED.**

_/S/ Francis J. Jones, Jr._
Francis J. Jones, Jr., Judge.