# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,    )
    )
    )
v.    )    **ID. No. 1909006430**
    )
    )
BRANDON HOLMES    )

Submitted: September 9, 2022
Decided: September 9, 2022
Written Opinion Issued: September 20, 2022

## MEMORANDUM OPINION AND ORDER

*Upon Defendant Brandon Holmes's Motion to Suppress*,
**DENIED**.

Daniel B. McBride, Esquire, Deputy Attorney General, DEPARTMENT OF JUSTICE, Wilmington, Delaware, for the State of Delaware.

Eugene J. Maurer, Jr., Esquire, EUGENE J. MAURER, JR., P.A., Wilmington, Delaware, Stephen P. Patrizio, Esq., DRANOFF AND PATRIZIO, P.C., Philadelphia, Pennsylvania, for Mr. Holmes.

**WALLACE, J.**

## I. FACTUAL AND PROCEDURAL BACKGROUND

On July 17, 2019, Delaware State Police ("DSP") officers responded to a midday shooting inside the Market Street Grill located at 4304 North Market Street in Wilmington.[1] Two men—Daqwan Riley and Defendant Brandon Holmes—had been shot there.[2] Both men had left via private transport for Christiana Care's Wilmington emergency room before the police arrived; that arrival was about four minutes after a 911 call had been received.[3]

When DSP detectives arrived at the Market Street Grill, they learned the witnesses present during the shooting were Roderick Millwood, the restaurant manager, and two restaurant employees, Danielle White and Jonathon Kornegay.[4] After interviewing the restaurant employees, and observing large amounts of blood on the dining room floor, it was determined that the shooting occurred inside the restaurant's public dining area.[5] The detectives were also informed that the

---

[1] Suppression Hr'g Tr. at 106, *State v. Brandon Holmes*, ID No. 1909006430 (Del. Super. Ct. July 8, 2022) (D.I. 68) (hereinafter "Hr'g Tr."); State's Resp., Oct. 20, 2021 (D.I. 53), Ex. C (Search Warrant Application and Affidavit) (hereinafter "Search Warrant") ¶ 2; Def.'s Mot. to Suppress ¶ 1, July 8, 2021 (D.I. 43); State's Resp. ¶¶ 1-2.

[2] Hr'g Tr. at 107; Def.'s Mot. to Suppress ¶ 1; State's Resp. ¶¶ 1-2.

[3] State's Resp. ¶¶ 1-2; *see* Def.'s Mot. to Suppress ¶ 1; Search Warrant ¶ 2. The restaurant's surveillance system reflects that the shooting occurred at 2:45 p.m and both parties seem to agree that the police responded at approximately 2:49 p.m.

[4] State's Resp. ¶ 2; Hr'g Tr. at 53, 99; Search Warrant ¶ 2; *see* Hr'g Tr. at 149-50.

[5] State's Resp. ¶¶ 1-2; Def.'s Mot. to Suppress ¶ 1; *see* Hr'g. Tr. at 112-13.

restaurant had a surveillance system equipped with several interior and exterior cameras that likely captured footage of the shooting and images its perpetrator(s).[6]

At some point during the initial on-scene investigation, Rashan Jason Baul— a purported co-owner of the Market Street Grill—arrived at the restaurant.[7] Mr. Baul contacted Delaware Camera Systems Inc., the company that installed the Grill's surveillance equipment, and requested that technicians come to the restaurant and assist detectives with reviewing and recovering the surveillance footage.[8]

With the help of the Delaware Camera Systems' technicians, DSP detectives were able to watch the surveillance footage on video monitors at the restaurant and download data onto a DSP-owned external hard drive.[9] Because they weren't convinced the footage "successful[ly] transfer[red]," the police also took the surveillance system's hard drive as a backup.[10] Soon thereafter, a detective assisting the lead investigators applied for and obtained a search warrant before the hi-tech

---

[6] Hr'g Tr. at 111-12.

[7] *Id.* at 25. According to a State of Delaware business license application, Mr. Baul and a Duane Holmes (identified at the hearing as Brnadon Holmes's mother), are co-owners of the restaurant. *Id.*, State's Ex. 2 (Business License Application). Mr. Baul and Ms. Holmes are also the named tenants in the restaurant lease agreement. *Id.*, Def.'s Ex. 1 (Lease Agreement). Despite this, Mr. Holmes contends that *he* is a part-owner—if not sole owner—of the Market Street Grill. *See* Def.'s Mot. to Suppress ¶ 8. As revealed below, the Court need not definitively determine the "ownership" of the restaurant to resolve this motion.

[8] Hr'g Tr. at 25-26, 139.

[9] *Id.* at 114-16.

[10] *Id.*

forensics detectives accessed the restaurant footage stored on the collected hard drive.[11]

The search warrant's supporting affidavit describes what the detectives observed on the surveillance recording's playback while at the restaurant.[12] The shooter is described as entering the restaurant, briefly looking at a menu, and then pulling a handgun from his vest and shooting both Messrs. Holmes and Riley at close range.[13] The shooter appeared to be clad in "a construction helmet, sunglasses and a traffic control style shirt."[14] After shooting the two victims, the assailant "calmly exited" the restaurant.[15]

It wasn't until after rewatching the surveillance recording several times that detectives noticed Mr. Holmes sat up and got to his knees just after being shot.[16] Mr. Holmes is then observed gesturing to Mr. Millwood and Ms. White. Despite multiple gunshot wounds and profuse bleeding, Mr. Holmes is able to stand with Ms. White's assistance. Once standing, Mr. Holmes then appears to remove a handgun from his waistband and hand it off to Mr. Millwood, who then gave it to

---

[11] Hr'g Tr. at 116-17.

[12] *See* Search Warrant ¶ 6.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] Hr'g Tr. at 154-55; State's Resp. ¶ 5.

-4-

Mr. Kornegay.[17] Mr. Kornegay is seen walking towards and into the employee bathroom, where he emerges seconds later emptyhanded.[18] Finally, Mr. Millwood is observed assisting Mr. Holmes exit the restaurant.[19]

Within a week of the shooting, the police returned to the Market Street Grill to execute a search warrant in hopes of finding the handgun they believe they saw Mr. Holmes pass off. Their search came up empty.[20]

Mr. Holmes has been indicted on the following felony charges: one count of Possession of a Firearm by a Person Prohibited ("PFBPP"); one count of Tampering with Physical Evidence; and one count of Conspiracy Second Degree.[21] The trial of those charges is set to begin today. And this is the Court's written decision on Mr. Holmes's motion to suppress the Market Street Grill surveillance footage.

## II. PARTIES' CONTENTIONS

### A. MR. HOLMES'S MOTION TO SUPPRESS

Mr. Holmes seeks to exclude all evidence obtained from the restaurant's surveillance footage.[22] He initially raised three challenges, but after the suppression

---

[17] State's Resp. ¶ 5.

[18] *Id.*

[19] *Id.*

[20] *Id.* ¶ 6.

[21] Indictment, Sept. 16, 2019 (D.I. 1).

[22] Def.'s Mot. to Suppress at 1.

hearing, he narrowed that to two.[23]  First, Mr. Holmes argues that the detectives'

initial, on-scene watching of the surveillance footage was an illegal search or seizure

because that viewing was conducted without a warrant and unsupported by exigent

circumstances.[24]  Second, Mr. Holmes argues the subsequent surveillance video

search warrant lacked temporal limitations, thereby constituting an impermissible

"general warrant."[25]

## B. THE STATE'S OPPOSITION

First, the State contends that Mr. Baul gave the detectives valid permission to

collect the surveillance footage.[26]

Second, the State asserts that the search warrant for the surveillance system

was valid because temporal limitations were included as the affiant noted a 30-day

timespan in relation to the investigation, *i.e.*, the surveillance system only stores a

maximum of one-month's worth of data at a time.[27]

In its supplemental briefing, the State makes two additional arguments.  Third,

that—if a search or seizure occurred—the immediate warrantless watch of the

---

[23] At the suppression hearing, his counsel confirmed that Mr. Holmes is not pursuing the *Franks* issue he first posited.  Hr'g Tr. at 65; *see generally Franks v. Delaware*, 438 U.S. 154 (1978) (allowing a criminal defendant to challenge evidence collected on the basis of a warrant granted on false statements of facts).

[24]  Def.'s Mot. to Suppress ¶¶ 7-10.

[25]  *Id.* ¶¶ 16-20.

[26]  State's Resp. ¶¶ 15-16.

[27]  *Id.* ¶¶ 17-19.

surveillance footage at the Market Street Grill was valid under the emergency doctrine exception to the warrant requirement.[28]  And last, that Mr. Baul's actions were more than mere consent—he proactively volunteered the surveillance footage to the detectives.[29]

The State initially argued that Mr. Holmes lacked standing to challenge the collection of the surveillance footage because he failed to demonstrate a personal connection or actual expectation of privacy in the restaurant's surveillance system.[30] In supplemental briefing, the State said it was no longer contesting Mr. Holmes's standing.[31]  Given this concession, the Court presumes without deciding that Mr. Holmes has sufficient standing to bring his challenge.

## III.  STANDARD OF REVIEW

Mr. Holmes's Motion to Suppress challenges what he terms:  (1) a warrantless search and seizure—the immediate on-scene viewing of Market Street Grill's dining room surveillance footage and subsequent collection of the digital drive containing that video; and (2) a search for which a subsequent warrant had been issued—the later viewing and collection of the shooting footage from that digital drive by hi-tech

---

[28]  State's Supp. Resp. ¶ 15, Aug. 31, 2022 (D.I. 71).

[29]  State's Supp. Resp. ¶¶ 3-5.

[30]  State's Resp. ¶¶ 9-14.

[31]  State's Supp. Resp. ¶ 2.

forensics detectives. As each arguably invokes a different standard of review, the respective challenges will be analyzed accordingly.

### A. MOTION TO SUPPRESS – WARRANTLESS SEARCH OR SEIZURE

The United States and Delaware Constitutions guarantee protection from "unreasonable searches and seizures" by government actors.[32] On a defendant's motion to suppress evidence that was obtained without a warrant, the State must substantiate the propriety of the challenged intrusion by a preponderance of the evidence.[33] To do so, the State must establish that "the challenged seizure comported with the rights guaranteed by the United States Constitution, the Delaware Constitution, and relevant statutes."[34]

As a general matter, "[a] warrantless search [or] seizure is presumptively unreasonable, subject to certain exceptions."[35] And while it is a rather odd circumstance that instigates Mr. Holmes's challenge here—*i.e.*, the immediate on-scene police investigation of his victimization where the police watched and seized a recording of that very crime, which also happened to include evidence of Mr.

---

[32] U.S. CONST. amend. IV; DEL. CONST. art. I, § 6.

[33] *State v. Henderson*, 906 A.2d 232, 235 (Del. Super. Ct. 2005) (citing *Hunter v. State*, 783 A.2d 558, 560 (Del. 2001)).

[34] *State v. Roundtree*, 2017 WL 4457207, at *2 (Del. Super. Ct. Oct 4, 2017) (citing *State v. Lambert*, 2015 WL 3897810, at *3 (Del. Super. Ct. June 22, 2015), *aff'd* 149 A.3d 227 (Del. 2016)).

[35] *Id.* (citing *State v. Hedley*, 593 A.2d 576, 582 (Del. Super. Ct. 1990)).

Holmes's own illegal gun possession—some of those exceptions, directly or by analogy, do apply and assist in the analysis here.

### 1. *Exigent Circumstances – The Emergency Exception Doctrine*

Delaware courts recognize the emergency exception doctrine as but one species of exigent circumstances;[36] this exception permits an otherwise disallowed intrusion if there is an immediate need for the assistance of police.[37]  A warrantless intrusion is lawful under the emergency doctrine if the State can establish that:

> (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. (2) The search must not be primarily motivated by intent to arrest and seize evidence. (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.[38]

To be valid, the search (or, here, seizure) must have a direct relationship between that intruded upon place (or, here, item) and the emergency.[39]

### 2. *Plain View*

Another well- and long-accepted exception is the plain view doctrine, which allows officers to seize evidence in their direct observation.[40]  A warrantless seizure is valid under the plain view doctrine if the State can establish that: "(1) the officer

---

[36]  *See Hall v. State*, 14 A.3d 512, 515-18 (Del. 2011).

[37]  *Roundtree*, 2017 WL 4457207, at *2 (citing *Guererri v. State*, 922 A.2d 403, 406 (Del. 2007)).

[38]  *Guererri*, 922 A.2d at 406.

[39]  *See Roundtree*, 2017 WL 4457207, at *3.

[40]  *Hardin v. State*, 844 A.2d 982, 985 (Del. 2004).

is lawfully in a position to observe the [item], (2) the item's evidentiary value is immediately apparent, and (3) the officer has a lawful right of access to the item."[41]

### 3. *Consent*

Yet one more recognized exception to the warrant requirement is for searches conducted pursuant to valid consent.[42] To be valid, consent must be voluntary—whether express or implied[43]—and the consenting individual must have the authority to grant the consent.[44] "Third party authority to consent to a search must include both possession and equal or greater control, *vis-à-vis* the owner, over the area to be searched."[45]

"[A] third party's consent to a warrantless search cannot be implied from a mere property interest, since the authority justifying such consent is not derived from the law of property. Rather, it rests on mutual use of the property by persons generally having joint access or control for most purposes[.]"[46] Upholding this

---

[41] *McDougal v. State*, 2015 WL 7272051, at *2 (Del. Nov. 16, 2015) (quoting *Hardin*, 844 A.2d at 985). Although that case law uses the term "contraband" in addition to "item," that is of no moment as both concern seizing that which has obvious immediate evidentiary value, whether that seized is an illegal narcotic or a digital recording.

[42] *Scott v. State*, 672 A.2d 550, 552 (Del. 1996) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 221-22 (1973)).

[43] *Cooke v. State,* 977 A.2d 803, 855 (Del. 2009) ("Consent may be express or implied, but this waiver of Fourth Amendment rights need not be knowing and intelligent." (citing *Schneckloth,* 412 U.S. at 241)).

[44] *Id.* (citing *United States v. Matlock*, 415 U.S. 164, 171 (1974)).

[45] *Scott*, 672 A.2d at 552 (citing *Ledda v. State*, 564 A.2d 1125, 1128 (Del. 1989)).

[46] *State v. Passerin*, 449 A.2d 192, 197 (Del. 1982) (citation omitted); *see also State v. Devonshire*, 2004 WL 94724, at *1 (Del. Super. Ct. Jan. 20, 2004) (explaining that Delaware's

-10-

principle in *DeShields v. State*, the Delaware Supreme Court explained: "Police may conduct a warrantless search if consent is obtained from a third party who possesses common authority over or other sufficient relationship to the premises or effects sought to be inspected."[47]  Common authority is a factual question requiring the trial court to determine:

> the use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that *others have assumed the risk that one of their number might permit the common area to be searched.*[48]

Thus, one "who shares common authority over otherwise private space assumes the risk that the other person will allow in unwanted people."[49]

Delaware and federal authorities are in sync with respect to third-party consent based on *actual* authority.[50]  However, the consent of a third-party with *apparent* authority—that is simply appearing to have authority—is invalid unless actual consent is found.[51]  Just like a search or seizure conducted pursuant to an

---

consent exception is generally narrow and doesn't recognize a good faith exception to its Constitutional search warrant requirement (citing *Dorsey v. State*, 761 A.2d 807, 819-20 (Del. 2000))).

[47]  534 A.2d 630, 643 (Del. 1987).

[48]  *Id.* (emphasis added) (citation omitted); *see Donald v. State*, 903 A.2d 315, 320 (2006).

[49]  *Devonshire*, 2004 WL 94724, at *3.

[50]  *Id*.

[51]  *Id*. at *4 (holding that a house-sitter generally has actual authority to allow visitors into a home; however, the house-sitter didn't have common authority over the defendant's bedroom to consent to a search thereof.  Despite the house-sitter's limited permission to enter the bedroom for incidental purposes, she lacked apparent authority to consent to its search because she "appeared

-11-

invalid warrant cannot stand, one occurring "under the consent exception to the warrant requirement cannot be valid unless valid consent is actually present."[52]

When determining whether consent was given voluntarily, courts consider

> the totality of the circumstances surrounding the consent, including (1) knowledge of the constitutional right to refuse consent; (2) age, intelligence, education, and language ability; (3) the degree to which the individual cooperates with police; and (4) the length of detention and the nature of questioning, including the use of physical punishment or other coercive police behavior.[53]

## B. MOTION TO SUPPRESS – WARRANT CHALLENGES

On a motion to suppress contesting the validity of a search warrant, the defendant shoulders the burden of establishing that the challenged search or seizure was unlawful.[54] The Delaware Constitution provides that a search warrant may be issued only upon a showing of probable cause.[55]

"It is well-settled that the Court must employ a 'four-corners' test to determine whether an application for a warrant demonstrates probable cause."[56] Under the test,

---

to be no more than what she was, a temporary house sitter." Thus, her apparent authority to consent was trumped by her lack of actual authority, and the search was deemed invalid.).

[52] *Id.* at *6.

[53] *Cooke*, 977 A.2d at 855 (citation omitted).

[54] *State v. Sisson*, 883 A.2d 868, 875 (Del. Super. Ct. 2005) (internal citations omitted).

[55] *See* DEL. CONST. art. I, § 6 ("The people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or thing, shall issue without describing them as particularly as may be; nor then, unless there be probable cause supported by oath or affirmation.").

[56] *Sisson*, 883 A.2d at 876 (citing *Pierson v. State,* 338 A.2d 571, 573 (Del. 1975)).

a reviewing court must discern whether the supporting affidavit "set[s] forth sufficient facts on its face for a judicial officer to form a reasonable belief that an offense has been committed and that seizable property would be found in a particular place."[57] In addition to being "supported by probable cause," a search warrant must "be as particular as possible."[58] Specifically, "[t]he warrant must describe the things to be searched with sufficient particularity and be no broader than the probable cause on which it is based."[59]

The judicial officer who made the initial finding of probable cause is owed great deference, and such a finding won't be "invalidated by a hypertechnical, rather than a common sense, interpretation" of the affidavit.[60] The reviewing court must view the application "as a whole and not on the basis of its separate allegations."[61]

---

[57]  *Id.* (internal quotations and citations omitted).

[58]  *Taylor v. State*, 260 A.3d 602, 613 (Del. 2021).

[59]  *Wheeler v. State*, 135 A.3d 282, 299 (Del. 2016) (citation omitted); *see Taylor*, 260 A.3d at 616 (rejecting warrant as not sufficiently limited because it "authorized a search of 'any and all data' on the smartphones[,]" instead of "limit[ing it] to smartphone data tied specifically to the probable cause supporting the warrant").

[60]  *Cooper v. State*, 228 A.3d 399, 404 (Del. 2020) (quoting *Jensen v. State,* 482 A.2d 105, 111 (Del. 1984)). *See Carroll v. United States*, 267 U.S. 132, 146 (1925) ("The Constitution does not forbid search, as some parties contend, but it does forbid unreasonable search.").

[61]  *Jensen*, 482 A.2d at 111 (citations omitted).

-13-

# IV. DISCUSSION

***MR. HOLMES CERTAINLY WAS THE VICTIM OF A SHOOTING, BUT NOT OF ANY DISCERNIBLE CONSTITUTIONAL VIOLATION PERPETRATED BY THE POLICE TRYING TO SOLVE THAT CRIME.***

### A. THE IMMEDIATE ON-SCENE VIEWING AND COLLECTION OF THE MARKET STREET GRILL SURVEILLANCE FOOTAGE WAS EMINENTLY REASONABLE.

As a starting point, again, the United States and Delaware Constitutions afford protection from "unreasonable searches and seizures."[62]  Both guarantee that one's "persons, houses, papers, and effects," will not be subject to certain government intrusion.[63]  But as the text of both make clear, it is only an ***unreasonable*** search or seizure that violates one's rights.

An unreasonable search or seizure, under both Constitutions, occurs if (1) an "'individual manifested a subjective expectation of privacy in the object of the challenged search,' and [(2)] 'society [is] willing to recognize that expectation as reasonable.'"[64]  But "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."[65]  This test,

---

[62]  U.S. CONST. amend. IV; DEL. CONST. art. I, § 6.

[63]  U.S. CONST. amend. IV; DEL. CONST. art. I, § 6 (protecting "persons, houses, papers and possessions").

[64]  *Everett v. State*, 186 A.3d 1224, 1229 (Del. 2018) (addition in original) (quoting *Kyllo v. United States*, 533 U.S. 27, 33 (2001)).

[65]  *Katz v. United States*, 389 U.S. 347, 351 (1967).

first recognized in *Katz v. United States*,[66] requires that both parts—subjective expectation of privacy, a factual inquiry, and objective societal expectation, more of a legal inquiry—be satisfied.[67]

These concepts provide an important backdrop to resolving this particular challenge, where the recorded activity occurred in what was, at the time, in a wholly public place. One might rightly wonder whether the investigating officers' immediate on-scene watching and collection of the restaurant's surveillance implicate the Fourth Amendment or Article One, Section Six at all. And one can easily reject Mr. Holmes's proposition that without first obtaining a warrant, the police immediately responding to the Market Street Grill should have never entered the business's office, watched the recorded footage of the shooting that had just occurred there, nor collected that recording as evidence.

Perhaps upon trying to fit this challenged police activity into a constitutional framework, one could stretch to assume the first prong of *Katz* might be met, but likely not the second. That is because society recognizes no objective reasonable expectation of privacy in readily observable activity occurring in the public dining

---

[66] *Id.*

[67] *Everett*, 186 A.3d at 1229; *State v. Howard*, 728 A.2d 1178, 1181 (Del. Super. Ct. 1998).

area of a restaurant during regular business hours.[68]  So it is hard to fathom, under these circumstances, that the recording of such would warrant the level of protection Mr. Holmes now tries to attach to it.

As the United States Supreme Court has explained, there is no Fourth Amendment protection for what a person exposes to the public.[69]  Here, the surveillance footage captured the dining area of a restaurant, which was open to the public.[70]  It was in fact this public access of the restaurant that allowed the shooter to enter.[71]  Anyone was free to enter or exit that dining area and watch what was going on there.  Mr. Holmes suggests that he sought to "preserve as private"[72] the area where the shooting occurred and his discard of his own gun (or more aptly the recording of such), but it is important to recall that this part of the restaurant was held open to the public even if the recording of its goings-on was not.

And because the test is objective, in that it asks what society's expectation is, common sense would dictate that it matters not the purpose Mr. Holmes had when recording what the restaurant's surveillance camera detected; what matters is

---

[68]  *Smith v. Bd. of Cty. Comm'r for Cty. of Otero, N.M.*, 316 Fed. Appx. 786, 789 (10th Cir. 2009) (affirming the district court's finding that the appellant restaurant owners "retain[] no reasonable expectation of privacy in the public areas of their restaurant").

[69]  *Katz*, 389 U.S. at 351.

[70]  *See* Hr'g Tr. at 152.

[71]  *See id.*

[72]  *Katz*, 389 U.S. at 351.

whether there is a reasonable expectation of privacy in what is recorded on it. There isn't.

So at this very first stage, it is hard to glean how Mr. Holmes establishes that he both has a subjective expectation of privacy in the recording and there existed an objectively reasonable societal expectation of privacy therein such that any warrantless seizure thereof, in these particular circumstances, would be unreasonable.[73] And application of some of the concepts mentioned earlier demonstrates just why that is so.

### B. IMMEDIATE INVESTIGATION OF MR. HOLMES'S SHOOTING AND POSSIBLE IDENTIFICATION OF HIS ASSAILANT PRESENTED EXIGENT CIRCUMSTANCES.

Under the emergency doctrine, police may conduct what might otherwise be deemed an illegal entry, search, or seizure where "there is an immediate need for the assistance of police to protect life or property."[74] When challenged, the State must establish that a direct relationship existed between the area searched (or the item seized) and the emergency.[75]

No doubt, the events that transpired here—a spontaneous, unprovoked, daytime shooting inside of a restaurant, with the fleeing shooter still at large—is an

---

[73] *Everett v. State*, 186 A.3d 1224, 1229 (Del. 2018).

[74] *Roundtree*, 2017 WL 4457207, at \*2 (citing *Guererri*, 922 A.2d at 406).

[75] *Guererri*, 922 A.2d at 407.

exigent circumstance requiring "immediate need for the assistance of police to protect life or property."[76]

The police responded to the Market Street Grill to investigate a shooting at 2:49 p.m. Based on the surveillance system's real-time clock, the shooting occurred at 2:45 p.m. So, police were on the scene almost immediately, arriving *four minutes after the shots were fired*.[77]

Once on scene, police observed large pools of blood inside the restaurant's dining room and were informed there were both internal and external surveillance cameras.[78] Knowing that the shooter—who discharged a firearm and seriously injured two men *four minutes prior* to their arrival—was still at large, the detectives' otherwise warrantless entry into the back office of the restaurant to watch the surveillance footage was directly related to their need to both understand what had just occurred there and immediately identify and apprehend the offender.[79] An at-large shooter surely is a circumstance requiring immediate police action to protect life or property.[80]

---

[76]  *Roundtree*, 2017 WL 4457207, at *2 (citing *Guererri*, 922 A.2d at 406).

[77]  *See* State's Resp. ¶¶ 2, 4.

[78]  *Id.* ¶ 2.

[79]  Hr'g Tr. at 108-09.

[80]  *See*, *e.g.*, *Dixon v. State,* 996 A.2d 1271, 1278-79 (Del. 2010) (contents of a 911 call were non-testimonial because exchange therein "was necessary to resolve a present emergency . . . [and] that was true even of the operator's effort to establish the identity of the assailant") (cleaned up).

Given the mere minutes that had passed between the shooter fleeing and police responding, an ongoing emergency requiring immediate police attention was indeed present. Under any reasonable view of the situation, the police were right that unnecessary delay in accessing the surveillance system and viewing its recording might have frustrated legitimate police objectives, further endangered others, and allowed more distance between the shooter and investigators. Mr. Holmes is simply mistaken that because "the crime had been completed and the suspect had escaped" the scene there was no urgency to getting to the restaurant's recording.[81] Quite to the contrary, the completed crime resulting in serious bodily injury and the gunman's then at-large status is exactly the circumstance that made the warrantless review of the surveillance tape vital.[82]

Exigent circumstances were manifest here, and the police were justified in promptly watching the restaurant's recording to, at the very least, aid in the imminent apprehension of a fleeing shooter.

---

[81] Def.'s Mot. to Suppress ¶ 10.

[82] Indeed, other courts have recognized the exigency of seizing and securing surveillance footage that might have recorded a crime or critical evidence thereof because of the nature of recording technology itself. *Rameriz v. State*, 174 N.E.3d 181, 188-90 (Ind. 2021) (finding exigent circumstances existed to seize the recording device of an external security camera while executing "a search warrant to photograph/videotape [the defendant's] parents' property" since the officers reasonably believed "the recorder contained 'potentially fleeting evidence' that was 'clearly critical to the investigation")"; *People v. Tran*, 255 Cal.Rptr.3d 26, 32-35 (Cal. Ct. App. 2019) (finding exigent circumstances existed to seize the defendant's dash camera, since it was clear that camera contained evidence which could be destroyed either intentionally or inadvertently).

**C. THE PLAIN VIEW DOCTRINE ALSO SUPPORTS THE COLLECTION OF THE DIGITAL DRIVE CONTAINING THE RECORDING OF MR. HOLMES SHOOTING.**

Once the police knew there was recorded surveillance footage that likely captured the shooting—whether they had viewed its contents on-scene or not—that footage could be lawfully seized as an item in plain view.[83] A warrantless search is valid under the plain view doctrine if the State can establish that: "(1) the officer is lawfully in a position to observe the [item], (2) the item's evidentiary value is immediately apparent, and (3) the officer has a lawful right of access to the item."[84]

It is indisputable that the police were lawfully in a position to observe the recording devices—both cameras in the dining room and recorder in the office—while securing and investigating the scene (that being the whole of the Market Street Grill) of what clearly was an attempted homicide. No doubt, the police had a lawful right of access to any of the on-scene physical evidence of that crime. And even without knowing its specific contents, the digital drive's evidentiary value was immediately apparent. Common sense would tell any investigator that the digital device had as much evidentiary value, if not more, than fingerprints lifted, blood stains photographed and swabbed, shell casings collected, or projectiles dug out of a wall. As did those other forms of physical evidence, the hard drive just needed a bit more processing to uncover its full evidentiary worth.

---

[83] *Hardin*, 844 A.2d at 985.

[84] *McDougal*, 2015 WL 7272051, at *2 (quoting *Hardin*, 844 A.2d at 985).

That said, the on-scene viewing of the footage on that drive—which the Court has already deemed valid—revealed that it had captured the shooting as it occurred.[85] While Mr. Holmes dauntlessly insists otherwise, there is likely no more prized evidence than a real-time recording of a crime like this as it occurs. Any argument contesting the immediately apparent evidentiary value of the footage of the shooting and its proximate surroundings is fallacious.

The collection of the Market Street Grill's surveillance hard drive was permissible under the plain view doctrine.

**D. THE POLICE HAD VALID CONSENT TO VIEW AND COLLECT THE RESTAURANT'S SURVEILLANCE RECORDING.**

In addition to the above, the police also had valid consent to view and seize the hard drive containing the surveillance footage; that consent being granted by Mr. Baul.

The credible evidence demonstrates that Mr. Baul would be considered at least a part owner or controller of the Market Street Grill property. While Messrs. Holmes and Baul both downplayed Mr. Baul's involvement there,[86] the facts demonstrate sufficient acts and control for anyone to deem Mr. Baul able to grant valid consent to the collection of the property's surveillance footage.

---

[85] Hr'g Tr. at 115, 150.

[86] Hr'g Tr. at 37-41, 78; State's Hrg. Ex 2.

Mr. Baul signed the restaurant's lease agreement.[87] He had access to the restaurant's bank account such that he would sometimes write checks from the restaurant to pay for services rendered.[88] Mr. Baul's name was on the restaurant's state business license.[89] And the provider who installed the Market Street Grill's surveillance system, Art Wheeler a.k.a. "the camera guy," averred that he believed Mr. Baul was an owner of the business.[90] Given all this, the Court finds Mr. Baul had common authority over or other sufficient relationship to the restaurant and its effects—including the surveillance system.

Now, Mr. Holmes says that the police were at some point told by Mr. Baul that he was not "an owner" of the Market Street Grill. So, according to Mr. Holmes, even if Mr. Baul had given his consent to collect the restaurant's surveillance footage, that consent was not valid.[91] But in Mr. Holmes's supplemental brief[92] he admits that it was only after police viewed the footage on-scene and collected the surveillance system's hard drive that a detective spoke to Mr. Baul in any detail.[93]

---

[87] Hr'g Tr. at 35-36.

[88] *Id*. at 31, 62.

[89] *Id*. at 38-40; State's Hr'g Ex. 2.

[90] *Id*. at 22, 50-51, 78; Joint Hr'g Ex. 2 (Affidavit of Art Wheeler).

[91] Def.'s Supp. Br. ¶¶ 1-2, Aug. 15, 2022 (D.I. 70).

[92] Mr. Holmes submitted both a supplemental brief and an additional reply to the State's supplemental brief. The Court ordered only one post-hearing filing for each side. *See* Hr'g Tr. at 160; *see also* D.I. 67. That notwithstanding, to be complete, the Court has fully considered Mr. Holmes's unsolicited reply.

[93] Def.'s Supp. Br. ¶ 2; Hr'g Tr. at 27-29.

This timing is important because when police collected the hard drive they were operating under the very reasonable understanding that Mr. Baul had actual authority to consent to the viewing and seizure of the surveillance footage.[94]

Mr. Baul arrived at the restaurant shortly after the shooting occurred and cooperated with, no, was insisting that, the police should get the video to "find out who did this."[95] And so Mr. Baul, of his own accord—not necessarily because of any police prompting—initiated a call to Delaware Camera Systems to send technicians to help police obtain the recorded surveillance.[96] Given the totality of credible evidence of Mr. Baul's involvement with the Market Street Grill's business structure, initial setup, and ongoing operations, the Court finds he had actual authority to consent. Indeed, Mr. Holmes himself had imbued him with such authority.[97]

---

[94] *Id.* at 114.

[95] *Id.* at 25-26, 45-46, 51, 128-29, 139.

[96] *Id*. at 25-26, 128-29, 139.

[97] THE COURT:  Okay. And from what you had said, the reason you put Mr. Baul on all these things is basically you trusted him with your business?

MR. HOLMES:  Yes.

THE COURT:  You trusted him –

MR. HOLMES:  Yes.

THE COURT:  -- financially? You trusted him to be on the lease? You trusted him with the surveillance stuff?

MR. HOLMES:  Yeah.

*Id*. at 97-98.

So, though Mr. Baul testified that he was never expressly asked by the police if he "consented" to them accessing the camera system,[98] his actions in calling Mr. Wheeler to send technicians to assist the police are sufficient to establish by a preponderance of the evidence that he at the very least implicitly consented to the seizure.[99] Clearly, the technicians operated on directions from Mr. Baul to get the footage to the police.[100] And there is nothing in the record that would invalidate either his authority or his aid and consent in allowing its collection. [101]

## E. WHILE LIKELY UNNECESSARY, THE WARRANT ALLOWING ACCESS TO THE HARD DRIVE'S CONTENTS WAS NONETHELESS VALID.

A valid search warrant must be particular, specifically identifying "the place to be searched, and the persons or things to be seized."[102] The particularity requirement prevents the issuance of general warrants that may be overly intrusive and not narrowly tailored to their justifications.[103] A supporting affidavit must "set forth sufficient facts to warrant a reasonable man in concluding that a crime has been committed and that the property sought to be seized would be found in a particular

---

[98] *Id*. at 29.

[99] *Flonnory v. State*, 109 A.3d 1060, 1063 (Del. 2015) ("consent may be express or implied, but this waiver of Fourth Amendment rights need not be knowing and intelligent.") (quoting *Cooke*, 977 A.2d at 855).

[100] *See* Hr'g Tr. at 45-46, 50-51, 139.

[101] *See Cooke*, 977 A.2d at 855.

[102] *Wheeler*, 135 A.3d at 295-96.

[103] *Id*. at 299.

place."[104]  To establish probable cause, "a nexus [must appear] between the items . . . sought and the place to be searched."[105]

Here, the first eight paragraphs of the affidavit of probable cause sufficiently detail the surrounding events of the Market Street Grill shooting such that a reasonable person would conclude that a crime had been committed and that relevant evidence would be found on the drive collected.

The affidavit describes the life-threatening injuries sustained by the two victims and their subsequent emergent surgeries, and what actions the police took during their initial response to and on-scene investigation of the restaurant shooting.[106]  It details the officers' discovery of the surveillance system that has "various remote cameras positioned throughout the restaurant that record and store data."[107]

Further described is what the officers observed on the surveillance system's recorded playback of the incident and that that previous viewing was done with the help of the technicians who installed the surveillance system.[108]  The detectives were informed that the drive contained "approx. 1 month of video storage."[109]  After

---

[104]  *Blount v. State*, 511 A.2d 1030, 1032-33 (Del. 1986) (citation omitted).

[105]  *Hooks v. State*, 416 A.2d 189, 203 (Del. 1980) (citations omitted).

[106]  Search Warrant ¶¶ 1-8.

[107]  *Id.* ¶ 3.

[108]  *Id.* ¶¶ 4-6.

[109]  *Id.* ¶ 9.

observing the recording, the surveillance system technicians "attempted to copy *just* the timeframe of the incident itself to a Delaware State Police external hard drive."[110] It was later discovered that transfer failed. In turn, the drive that was collected out of an abundance of caution[111] needed to be accessed.[112]

The authoring detective, after citing the foregoing in the supporting affidavit and search warrant application, requested: "All video surveillance data from all available camera views stored on the WD Purple video surveillance hard drive."[113] While Mr. Holmes suggests that there should have been either some temporal or content limitations placed, his cramped view and citation to cases with far different factual circumstances are unavailing.

First, unlike a smart phone, computer or other like device, the hard drive here had only one form of data or information—recorded video images of the happenings at the Market Street Grill. Second, Mr. Holmes offers no evidence that his time-partitioned examination of that data was technically feasible—*i.e.* that when

---

[110] *Id.* ¶ 8.

[111] Hr'g Tr. at 129-32, 139.

[112] From the warrant's averments (and even the expanded record now before the Court), it is reasonable to infer that the collected drive contains no other data or information but the silent video images recorded from the restaurant's cameras. So it is likely the detectives didn't need a search warrant to again access the footage that had already been seen. Yet, as a prophylactic, the hi-tech crime unit applied for a judicial authorization warrant before again viewing and extracting the footage. That unit's detectives routinely apply for search warrants before taking such action. *See Bradley v. State*, 51 A.3d 423, 436 (Del. 2012). But their caution in obtaining the search warrant does not mean the previously discussed warrant exceptions were not present or met.

[113] Search Warrant at 1.

exploring the drive itself one would be forensically capable of honing in on just the shooting footage. Third, Mr. Holmes—who in one breath unconvincingly argues the police didn't really need to collect the surveillance footage at all—ignores the investigative value of examining the entire 30 days of footage to determine if the shooter had for instance cased the scene before the shooting. Last, Mr. Holmes's implicit suggestion that one seeking or authorizing the warrant should expect that the police must stop viewing it as soon as the shooter leaves the restaurant, ignores the obvious investigative value of putting together the immediate aftermath also.[114]

Put plainly, sufficient nexus exists between the Market Street Grill shooting on July 17, 2019, and the recorded contents of the entire hard drive. It is manifest from the four corners of the affidavit that "*all* video evidence stored on the cameras" was written with knowledge that any such evidence *only* included one-month's worth of recorded restaurant video. The warrant and supporting affidavit requested "all video surveillance data from all available camera views"[115] to be "used or intended to be used for [the investigation of]: Assault 1st Degree: DE 11/0613 . . . ."[116] The affiant also explained that a search of the hard drive "may be valuable in the discovery of evidence pertinent to the planning of this shooting by the suspect or

---

[114] Hr'g Tr. at 129-32, 139.

[115] Search Warrant at 1.

[116] *Id.*

any associated accomplices."[117]  This is hardly an overreach or a broad "general warrant" allowing the police snatch up more than evidence necessary for the shooting investigation.

That search warrant allowing extraction of the footage—that, again, had already been validly watched and collected by the police at the crime scene—satisfied the particularity requirements.

## V. CONCLUSION

The dynamics of the initial investigation of the shooting of Brandon Holmes at the Market Street Grill allowed for the police to access, view, and collect the restaurant's surveillance footage of what occurred in its public dining area.  To put it in constitutional terms, each step was permitted under one, the other, or each of the plain view, exigent circumstances, or consent doctrines.

The search warrant, if necessary, to later access that footage on the surveillance system's digital drive:  met the constitutional particularity requirements; does not fail for lack of temporal limitations; and was supported by sufficient probable cause.

Accordingly, Mr. Holmes's Motion to Suppress must be **DENIED.**

**IT IS SO ORDERED.**

_____
Paul R. Wallace, Judge

---

[117] *Id.* ¶ 9.